**Exhibit "A"**





# COOPERATIVE APARTMENT
## FIXED RATE NOTE

August 17, 2009                                                                 New York, New York
[Date]                                                          [City]          [State]

434 East 52nd Street, Apartment 9B, New York, New York 10022
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $356,170.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is JP Morgan Chase Bank, N.A.. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.125%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6 (B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on October 1, 2009. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on September 1, 2039 I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79046, Phoenix, AZ 85062-9046 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $1,939.30.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits

will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

    (A) Late Charges for Overdue Payments

    If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    (B) Default

    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    (C) Notice of Default

    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    (D) No Waiver By Note Holder

    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    (E) Payment of Note Holder's Costs and Expenses

    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

    Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

    Any notice that must be given to the Note Holder under this Note will be given by delivering it or mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, either a Security Agreement or Loan Security Agreement (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is give to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Eiko Imai                          Borrower

_____ (Seal)
                                   Borrower

_____ (Seal)
                                   Borrower

_____ (Seal)
                                   Borrower

_____ (Seal)
                                   Borrower

_____ (Seal)
                                   Borrower

Pay to the Order of:
Without Recourse
JPMorgan Chase Bank, N.A.

By:_____
Mary Hunnicutt / Assistant Secretary

NEW YORK FIXED RATE NOTE - Single Family - FANNIE MAE/FREDDIE MAC  UNIFORM INSTRUMENT
*(Page 3 of 3)*                                                              Form 3233 1/01

BUILDING NO.: 434/52
APT. NO.: 9B
SHARES: 167

## SOUTHGATE OWNERS CORP.

Lessor,

TO

*Ann Mooney*

Lessee.

## PROPRIETARY LEASE

## TABLE OF CONTENTS

Accompanying Shares to Be Specified
in Proprietary Leases                                      2

Alterations                                               33

Appointment of Managing Agent as Purchaser's Agent        10

Assignment of Lessor's Rights Against Occupant             8

Assignment, Subletting or Unauthorized Occupancy          40

Authority Limited to Board of Directors                    3

Automobiles and Other Property                            38

Cancellation of Prior Agreements                          11

Cash Requirements Defined                                  2

Changes in Terms and Conditions of Proprietary Leases      7

Changes to Be in Writing                                  58

Charges for Gas and Electricity                           57

Collection of Rent from Subtenants                        42

Condemnation                                              41

Consents Generally:  Stockholder's and
Directors' Obligations to Consent                         27

Consents:  On Death of Lessee                             27

Continuance of Cooperative Management of
Building After All Leases Terminated                      47

Cooperation                                               35

Damage to Apartment or Building                            5

Default in Other Covenants                                40

-i-

| | |
|---|---|
| Default in Rent | 40 |
| Demised Premises; Term | 1 |
| Deposit of Maintenance Charges with Managing Agent | 10 |
| Deposits Required | 44 |
| Destruction of Building | 41 |
| Development Rights | 17 |
| Duty of Lessor | 29 |
| Effect of Partial Invalidity | 56 |
| Effective Date of Cancellation | 45 |
| Equipment and Appliances | 31 |
| Expiration of Lease Due to Damage | 6 |
| Extension of Option to Cancel | 46 |
| Failure to Fix Cash Requirements | 4 |
| Fees | 48 |
| Fees on Assignment | 28 |
| Foreclosure - Receiver of Rents | 55 |
| Further Assignment or Subletting | 27 |
| Governing Law | 58 |
| House Rules | 13 & 60 |
| Increase in Rate of Fire Insurance | 32 |
| Indemnity | 12 |
| Inspection of Books of Account; Annual Report | 6 |
| Involuntary Transferee | 28 |

Issuance of Additional Shares                                          3

Lease Subordinate to Mortgages and Ground Leases                     34

Lessee Becoming a Bankrupt or Default under Security
Agreement                                                            39

Lessee Ceasing to Own Accompanying Shares                            39

Lessee More Than One Person                                          56

Lessee's Default Under Security Agreement                            41

Lessee's Objectionable Conduct                                       40

Lessee's Option to Cancel                                            44

Lessor's Additional Remedies                                         56

Lessor's Immunities                                                  37

Lessor's Repairs                                                      4

Lessor's Right to Remedy Lessee's Defaults                           32

Lessor's Rights after Lessee's Default                               41

Loans by Purchasers                                                  48

Marginal Headings                                                    58

Mechanic's Lien                                                      35

No Abrogation of Rights of Lessee as Against Lessor                  11

No Discrimination                                                    57

No Waiver                                                            29

Notice to Lessor of Default                                          56

Notices                                                              37

Obligations of Lessee to Occupant                                    8

Occupancy by Non-Purchaser                                           8

Odors and Noises                                              31

Paid-in Surplus                                               4

Payment of Rent                                              12

Penthouse, Terraces and Balconies                            7

Permission to Show and Occupy Premises                      45

Pledge of Shares and Lease                                  29

Quiet Enjoyment                                             12

Reimbursement of Lessor's Expenses                         37

Release of Lessee Upon Assignment                          27

Removal of Fixtures                                        33

Removal of Fixtures; Possessions                           45

Rent (Maintenance); How Fixed                               1

Rent Abatement                                              5

Repairs by the Lessee                                      30

Right of Entry:  Key                                       35

Right of Lessees to Cancel                                 46

Rights of Holders of Unsold Shares and/or Sponsor          47

Rights of Non-purchasing Tenants
With Respect to Occupancy and Rentals                      11

Rights on Lessee's Default                                 46

Rules and Regulations and Requirements of Mortgage         31

Sale of Shares                                             43

Services by Lessor                                          4

Statement by Lessor                                        28

-iv-

Storage Space and Laundry                          37

Subletting                                         23

Subletting Apartment and Assignment of Lease       48

Surrender of Possession                            44

Surrender on Expiration of Term                     34

Termination by Lessor                              38

Termination of All Proprietary Leases              41

To Whom Covenants Apply                            55

Unity of Shares and Lease                          56

Use of Premises                                    13

Waiver of Right of Redemption                      44

Waiver of Subrogation                               6

Waiver of Trial by Jury                            55

Waivers                                            36

Window Cleaning                                    38

THIS PAGE LEFT BLANK INTENTIONALLY



## PROPRIETARY LEASE

PROPRIETARY LEASE made as of _November 20_, 1987, by and between Southgate Owners Corp., a New York corporation, having an office c/o M.J. Raynes Incorporated, 488 Madison Avenue, New York, New York hereinafter called the

Lessor, and _____ _Ann Mooney_ _____
hereinafter called the Lessee.

WHEREAS, the Lessor is the owner of each parcel of land and the building (together sometimes referred to as the "Property") erected thereon in the County of New York, State of New York, known as The Southgate and by the street addresses 400 East 52nd Street, 414 East 52nd Street, 424 East 52nd Street, 434 East 52nd Street and 433 East 51st Street, New York, New York (together or separately, as the context may require, hereinafter called the "Building"); and

WHEREAS, the Lessee is the owner of _167_ shares of the Lessor, to which this lease is appurtenant and which has been allocated to Apartment _9B_ in the Building with the street address _434 East 52nd Street_ ;

### Demised Premises; Term

NOW, THEREFORE, in consideration of the premises, the Lessor hereby leases to the Lessee, and the Lessee hires from the Lessor, subject to the terms and conditions hereof, Apartment _9B_ in the Building for a term from _November_, 1987, until September 30, 2061 (unless sooner terminated as hereinafter provided). As used herein "the Apartment" means the rooms in the Building as partitioned on the date of the execution of this lease designated by the above-stated Apartment number, together with their appurtenances and fixtures and any closets, terraces, maid's rooms, balconies, roof, or portion thereof outside of said partitioned rooms, which are allocated exclusively to the occupant of the Apartment.

### Rent (Maintenance); How Fixed

1.   (a)   The rent (sometimes called maintenance) payable by the Lessee for each year, or portion of a year, during the term shall equal that proportion of the Lessor's cash requirements for such year, or portion of a year, which the number of shares of Lessor allocated to the Apartment bears to the total number of shares of Lessor issued and out-

standing on the date of the determination of such cash re-
quirements.  Such maintenance shall be payable in equal
monthly installments in advance on the first day of each
month, unless the Board of Directors of the Lessor (here-
inafter called "Directors") at the time of its determination
of the cash requirements shall otherwise direct.  The Lessee
shall also pay Lessee's pro rata share (determined in the
same manner as maintenance) of any special assessment that
may be levied by Lessor from time to time to pay for any re-
pair, alteration, or improvement to the corporate property,
or any deficit from operations for a prior period, or other
cash requirements.  Such special assessment shall be deemed
additional rent and shall be payable in a lump sum or in
periodic installments, as the Directors shall determine.  The
Lessee shall also pay such additional rent as may be provided
for herein when due.

Accompanying Shares to Be Specified in Proprietary Leases

(b)  In every Proprietary Lease heretofore
executed by the Lessor there has been specified, and in every
Proprietary Lease hereafter executed by it there will be
specified, the number of shares of the Lessor issued to a
Lessee simultaneously therewith.

Cash Requirements Defined

(c)  "Cash requirements" whenever used herein
shall mean the estimated amount in cash which the Directors
shall from time to time in their judgment determine to be
necessary or proper for (1) the operation, maintenance, care,
alteration and improvement of the corporate property during
the year or a portion of the year for which such determina-
tion is made; (2) the creation of such reserve for contingen-
cies, repairs, replacements and general operations as they
may deem proper; and (3) the payment of any obligations, lia-
bilities or expenses incurred or to be incurred, after giving
consideration to (i) income expected to be received during
such period (other than rent from Proprietary Leases), and
(ii) cash on hand which the Directors in their discretion may
choose to apply.  The Directors may from time to time modify
their prior determination and increase or diminish the amount
previously determined as cash requirements of the Lessor for
a year or portion thereof.  No determination of cash require-
ments shall have any retroactive effect on the amount of rent
payable by the Lessee for any period prior to the date of
such determination.  All determinations of cash requirements
shall be conclusive as to all Lessees.

-2-

Until Unsold Shares (as defined in Paragraph 38 hereof) constitute less than 35% of the shares of Lessor allocated to Apartments in the Property, or the fifth anniversary of the consummation of the Plan, whichever first occurs, Lessor will not, without the consent of the holders of Unsold Shares, unless required by law, (i) increase the number, or change the type, of employees provided for in Schedule B set forth in the Cooperative Offering Plan for conversion of the premises of which the Apartment forms a part to cooperative ownership (the "Plan"); (ii) provide equipment or services in excess of those provided for in Schedule B, except as required by law; (iii) increase the Contingency Fund set forth in Schedule B, increase the Reserve Fund or the Working Capital Fund, or establish an operating fund, however designated, for any purpose whatsoever; (iv) refinance or increase the Purchase Money Mortgage or other mortgage indebtedness of Lessor; (v) prepay any interest or amortization on any such mortgage; (vi) make a new mortgage; (vii) sell the Property or lease the Building in its entirety; (viii) make any assessment for capital improvements, whether so designated on the books of the Lessor or not; (ix) increase the annual management fee, building insurance, legal and accounting fees or the fidelity bond set forth in said Schedule B; or (x) spend any sums, for any purposes whatsoever, other than those listed in Schedule B or required by law. Thereafter, until all Unsold Shares have been sold to purchasers for occupancy, no assessment for capital improvements will be made unless the Reserve Fund and the Working Capital Fund have been exhausted. Notwithstanding anything to the contrary set forth above, (a) the holders of Unsold Shares may not exercise veto power over expenses described in Schedule B or expenses required (i) to comply with applicable laws or regulations; (ii) to remedy any notice of violation; (iii) to remedy a work order of a mortgagee or an insurer, or (iv) to remedy a notice of default from a mortgagee.

Authority Limited to Board of Directors

(d) Whenever in this paragraph or any other paragraph of this lease, a power or privilege is given to the Directors, the same may be exercised only by the Directors, and in no event may any such power or privilege be exercised by a creditor, receiver or trustee.

Issuance of Additional Shares

(e) If the Lessor shall hereafter issue shares (whether now or hereafter authorized) in addition to those issued on the date of the execution of this lease, the

-3-

holders of the shares hereafter issued shall be obligated to
pay rent at the same rate as the other Proprietary Lessees
from and after the date of issuance.  If any such shares be
issued on a date other than the first or last day of the
month, the rent for the month in which issued shall be appor-
tioned.  The cash requirements as last determined shall, upon
the issuance of such shares, be deemed increased by an amount
equal to such rent.

Paid-in Surplus

          (f)  The Directors may from time to time as
may be proper determine how much of the maintenance and other
receipts, when received, shall be credited on the corporate
accounts to "Paid-in Surplus" (but not more than such amount
as represents payments on account of principal of mortgages
on property and other capital expenditures).  Unless the
Directors shall determine otherwise, the amount of payments
on account of principal of any mortgages shall be credited to
Paid-in Surplus.

Failure to Fix Cash Requirements

          (g)  The omission of the Directors to deter-
mine the Lessor's cash requirements for any year or portion
thereof shall not be deemed a waiver or modification in re-
spect of the covenants and provisions hereof, or a release of
the Lessee from the obligation to pay the maintenance or any
installment thereof, but the maintenance computed on the ba-
sis of the cash requirements as last determined for any year
or portion thereof shall thereafter continue to be the main-
tenance until a new determination of cash requirements shall
be made.

Lessor's Repairs

     2.   The Lessor shall at its expense keep the
Building in good repair, including all of the apartments, the
sidewalks and courts surrounding the same, and its equipment
and apparatus except those portions the maintenance and re-
pair of which are expressly stated to be the responsibility
of Lessees pursuant to Paragraph 18 hereof.

Services by Lessor

     3.   The Lessor shall maintain and manage the
Building and shall keep the elevators and the public halls,
cellars and stairways clean and properly lighted and heated,
and shall provide the number of attendants requisite, in the
judgment of the Directors, for the proper care and service of

-4-

of each fiscal year an annual report of corporate financial
affairs, including a balance sheet and a statement of income
and expenses, certified by an independent certified public
accountant.

Changes in Terms and Conditions of Proprietary Leases

        6.    Each Proprietary Lease shall be in the form of
this lease, unless a variation of any lease is authorized by
Lessees owning at least two-thirds of the Lessor's shares
then issued and outstanding and executed by the Lessor and
Lessee affected.   In this regard, the form and provisions of
any or all the Proprietary Leases then in effect and/or
thereafter to be executed may be changed by the approval of
Lessees owning at least two-thirds of the Lessor's shares
then issued and outstanding except that any such change af-
fecting all outstanding leases may only be changed by the ap-
proval of Lessees owning at least 75% of the Lessor's shares
then issued and outstanding and such changes shall be binding
on any or all, as the case may be, Lessees even if they did
not vote for such changes, except that (i) the proportionate
share of rent or cash requirements payable by any Lessee may
not be increased nor may his or her right to cancel the lease
under the conditions set forth in Paragraphs 35 and 38 be
eliminated or impaired without his or her express consent;
and (ii) the provisions of Paragraphs 1(c), 3, 6, 8, 14B and
38 may not be eliminated or impaired without the consent of
all holders of Unsold Shares.   Approval by Lessees as pro-
vided for herein shall be evidenced by written consent or by
affirmative vote taken at a meeting called for such purpose.

Penthouse, Terraces and Balconies

        7.    If the Apartment includes a terrace, balcony,
maid's room or a portion of the roof adjoining a penthouse,
the Lessee shall have and enjoy the exclusive use of the ter-
race, maid's room, balcony or that portion of the roof appur-
tenant to the penthouse, subject to the applicable provisions
of this lease and to the use of the yard, terrace, balcony or
roof by the Lessor to the extent herein permitted.   The Les-
see's use thereof shall be subject to such regulations as
may, from time to time, be prescribed by the Directors.   The
Lessor shall have the right to erect equipment on the roof,
including radio and television aerials and antennas, for its
use and the use of the Lessees in the Building and shall have
the right of access thereto for such installations and for
the repair thereof.   The Lessee shall keep the terrace, bal-
cony, or portion of the roof appurtenant to his or her Apart-
ment clean and free from snow, ice, leaves and other debris
and shall maintain all screens and drain boxes in good condi-

-7-

tion. No planting fences, structures or lattices shall be
erected or installed on the terraces, balconies, or roof of
the Building without the prior written approval of the Les-
sor. No cooking shall be permitted on any terraces, bal-
conies or the roof of the Building, nor shall the walls be
painted by the Lessee without the prior written approval of
the Lessor. Any planting or other structures erected by the
Lessee or his or her predecessor in interest may be removed
and restored by the Lessor at the expense of the Lessee for
the purpose of repairs, upkeep or maintenance of the
Building.

Occupancy by Non-Purchaser

        8.   If, at the date of commencement of this lease,
the Apartment is leased to a person who was a residential
tenant of the Apartment on the date the Plan was accepted for
filing who did not purchase under the Plan (sometimes re-.
ferred to as a "non-purchasing tenant"):

Assignment of Lessor's Rights Against Occupant

        (a)   The Lessor hereby assigns to the Lessee
all of the Lessor's rights against said third party from and
after the date of the commencement of the term hereof, and
the Lessee by the execution hereof assumes all of the Les-
sor's obligations to said third party from said date. The
Lessor agrees to cooperate with the Lessee, but at the
Lessee's expense, in the enforcement of the Lessee's rights
against said third party.

Obligations of Lessee to Occupant

        (b)   The Lessee acknowledges and agrees that:

        (i)   He or she will not have the right to
evict the tenant at any time, for any reason, including, but
not limited to, occupancy by the Lessee or his or her family,
except as follows.  The tenant may be evicted and any renewal
lease offered to him or her may provide that eviction
proceedings may be commenced for non-payment of rent, illegal
use and occupancy of the apartment, refusal of access or
other breaches by the tenant of his or her obligations to the
Lessee and that such non-purchasing tenant may have no
further rights to occupancy after expiration of his or her
lease if he or she fails to execute a renewal lease in a
timely fashion under law, and that there may be no obligation
to offer a renewal lease to or permit continued occupancy
after expiration of a lease by a non-purchasing tenant for
whom the Apartment is not a primary residence.

-8-

(ii)   The Apartment will continue to be subject to the New York City Rent and Rehabilitation Law and the regulations promulgated thereunder (rent control) or the New York City Rent Stabilization Law and the Code adopted pursuant thereto, as amended (the "Laws and Code").   The Apartment will also continue to be subject to the New York State Multiple Dwelling Law (the "MDL").   The Lessee will file annually with the New York State Division of Housing and Community Renewal ("DHCR") such information as shall be required by the DHCR in connection with the existing tenancy of the Apartment, including the then current rent therefor. If the Laws and Code are eliminated or become inapplicable, the tenant may not be subjected to unconscionable increases beyond ordinary rentals for comparable apartments during the period of his or her occupancy.

(iii)   The Lessee will be the landlord of the tenant and will have the responsibilities of any other landlord of a rent-controlled or rent-stabilized Apartment. The Lessee agrees to pay all maintenance charges and assessments due to the Lessor even if such amounts exceed the rent received from the tenant.   Furthermore, the Lessee will provide to the tenant, at the Lessee's sole expense, all services required of the landlord under the tenant's lease, and required by law, including all repairs to the Apartment which are not the responsibility of the Lessor under this lease.   These services may include, but are not limited to, interior painting and decoration, repairs to interior plumbing and wiring, and replacement of fixtures, appliances, doors, hardware and windows.

(iv)   The Lessee will offer to the tenant renewal leases for the Apartment, as applicable, at such times as may be required and for such rentals as may be permitted by the Laws and Code, together with such riders thereto as may be prescribed by the Laws and Code.

(v)   The unapplied portion of the tenant's security deposit, if any, has been assigned to the Lessee, and the Lessee will maintain the security deposit of the tenant in trust in an interest bearing account in accordance with the provisions of New York State General Obligations Law Section 7-103.

(vi)   In no event shall Lessee be permitted to inspect the Apartment of a non-purchasing tenant more than two times a month.   Inspections may only occur upon reasonable notice by Lessee.   In the event the non-purchasing tenant's lease contains a provision more restrictive than this requirement, such provision shall control.

-9-

Appointment of Managing Agent as Purchaser's Agent

        (c)   The Lessee hereby irrevocably appoints
the Managing Agent of the Building and its successors (or the
Lessor if no Managing Agent is employed), as the Lessee's
agent, for as long as the occupancy of the Apartment by non-
purchasing tenants continues, in order to provide for the
Lessee's account and at the Lessee's expense to the non-pur-
chasing tenants all services and facilities required by law
to be furnished or performed by Lessee under the non-pur-
chasing tenant's lease or tenancy or by law that are not to
be provided by Lessor under this lease.  Unless Lessee is a
holder of Unsold Shares, Lessee hereby agrees to pay to the
Managing Agent (or Lessor if no Managing Agent is employed)
such fee as may be customarily charged by managing agents to
perform such services.

Deposit of Maintenance Charges with Managing Agent

        (d)   Unless Lessee is a holder of Unsold
Shares, Lessee will at the time of his or her acquisition of
the shares allocated to the Apartment deposit with the Man-
aging Agent (or the Lessor if no Managing Agent is employed)
an amount equal to two months' maintenance charges for the
Apartment (the "Deposit") to be used as working capital to
furnish services required under the non-purchasing tenant's
lease or tenancy and applicable law.  Within 10 days after
notice by the Managing Agent (or the Lessor if no Managing
Agent is employed), that such Deposit has been diminished,
the Lessee will replenish such Deposit by making a further
deposit ("Further Deposit") in an amount equal to the differ-
ence between the balance of the Deposit and an amount equal
to two months of the then maintenance charges.  Lessee's
failure to timely replenish such Deposit shall result in
the Lessor having a lien against the Lessee's shares.  The
Lessee shall be entitled to receive interest, if any, earned
on such amount less interest in the amount equal to one per-
cent (1%) of the Deposit and Further Deposit which may be
retained by the Managing Agent (or the Lessor if no Managing
Agent is employed), on an annual basis as an administrative
fee.  The unapplied portion of the Deposit and Further De-
posit shall be returned promptly to Lessee at such time as
the non-purchasing tenant vacates the Apartment.  The Man-
aging Agent will be required to hold the Deposit and Further
Deposit in a special non-interest bearing account at a bank
authorized by the Lessor.  The Deposit and Further Deposit
will be held in trust and not be commingled with the monies
of, or become an asset of, the Lessor, the Managing Agent, or
the non-purchasing tenant.

-10-

Rights of Non-purchasing Tenants
With Respect to Occupancy and Rentals

(e)   Non-purchasing residential tenants shall
enjoy the following rights:

(i)   such non-purchasing tenants may not
be evicted by the Lessee for purposes of owner occupancy;

(ii)   such non-purchasing tenants who
reside in an apartment subject to government regulation as to
rentals and continued occupancy shall continue to be subject
thereto;

(iii)   the rentals of any such non-
purchasing tenants who reside in Apartments not subject to
government regulation as to rentals and continued occupancy,
and any such non-purchasing tenants who reside in Apartments
with respect to which government regulation as to rentals and
continued occupancy is eliminated or becomes inapplicable
after the Plan has become effective, shall not be subject to
unconscionable increases beyond ordinary rentals for compara-
ble apartments during the period of their occupancy.

Any non-purchasing tenant's renewal lease or re-
newal sublease may provide that eviction proceedings may
be commenced for non-payment of rent, illegal use or occu-
pancy of the premises, refusal of access to the Lessee, fail-
ure to renew the lease or non-primary residence of the non-
purchasing tenant or a similar breach by the non-purchasing
tenant of his or her obligations to the Lessee.

The sections of this lease concerning non-pur-
chasing tenants may not be amended or deleted.

No Abrogation of Rights of Lessee as Against Lessor

(f)   The rights of non-purchasing tenants with
respect to occupancy and rentals are governed and protected
by Section 352-eeee of the New York General Business Law and
the terms and provisions of the Plan.   Such rights are in-
tended for the benefit of non-purchasing tenants and are not
intended to abrogate the rights of the Lessee of the Apart-
ment as against the Lessor.

Cancellation of Prior Agreements

9.   If at the date of the commencement of this
lease, the Lessee has the right to possession of the Apart-
ment under any agreement or statutory tenancy, this lease

-11-

shall supersede such agreement or statutory tenancy which
shall be of no further effect after the date of commencement
of this lease, except for claims theretofore arising there-
under.

Quiet Enjoyment

10. The Lessee, upon paying the rent and perform-
ing the covenants and complying with the conditions on the
part of the Lessee to be performed as herein set forth,
shall, at all times during the term hereby granted, quietly
have, hold and enjoy the Apartment without any suit, trouble
or hindrance from the Lessor, subject, however, to the rights
of present tenants or occupants of the Apartment, and subject
to any and all mortgages and any underlying or overriding
lease or ground lease (any such lease being hereinafter col-
lectively called "ground lease") of the land or Building, or
both, as provided in Paragraph 22 below.

Indemnity

11. The Lessee agrees to save the Lessor harmless
from all liability, loss, damage and expense, including,
without limitation, attorneys' fees and expenses arising from
injury to person or property occasioned by the failure of the
Lessee to comply with any provision hereof, or due wholly or
in part to any act, default or omission of the Lessee or of
any person dwelling or visiting in the Apartment, or by the
Lessor, and their agents, servants or contractors when acting
as agent for the Lessee as in this lease provided. This
paragraph shall not apply to any loss or damage when Lessor
is covered by insurance which provides for waiver of subroga-
tion against the Lessee.

Payment of Rent

12. The Lessee will pay the rent to the Lessor
upon the terms and at the times herein provided, without any
deduction on account of any set-off or claim which the Lessee
may have against the Lessor, and if the Lessee shall fail to
pay any installment of rent promptly, the Lessee shall pay
interest thereon at the maximum legal rate from the date when
such installment shall have become due to the date of the
payment thereof (and any administrative or late fee which may
be imposed by the Board of Directors) and such interest and
fee shall be deemed additional rent hereunder.

-12-

House Rules

    13.   The Lessor has adopted House Rules which are
appended hereto, and the Directors may alter, amend or repeal
such House Rules and adopt new House Rules.  Such House Rules
when a copy thereof has been furnished to the Lessee, shall
be taken to be part hereof, and the Lessee hereby covenants
to comply with all such House Rules and see that they are
faithfully observed by the family, agents, invitees, contrac-
tors, guests, employees and subtenants of the Lessee.  Breach
of a House Rule shall be a default under this lease.  The
Lessor shall not be responsible to the Lessee for the non-
observance or violation of House Rules by any other Lessee or
person.

Use of Premises

    14.   A.   (1)  The Lessee, if an individual or in-
dividuals, shall not, without written consent of the Lessor
on such conditions as Lessor may prescribe, occupy or use the
Apartment or permit the same or any part thereof to be occu-
pied or used for any purpose other than as a private dwelling
for the Lessee and Lessee's spouse, their children, grand-
children, parents, grandparents, brothers and sisters and
domestic employees, or for professional and ancillary busi-
ness uses as permitted by law.  Any use of the Apartment must
conform to the terms and conditions of the existing certifi-
cate of occupancy for the Building and all applicable govern-
mental and municipal regulations and any other applicable
laws or regulations.  In no event however, shall more than
one married couple occupy the Apartment without the written
consent of the Lessor.  In addition to the foregoing, the
Apartment may be occupied from time to time by guests of the
Lessee for a period of time not exceeding one month, unless a
longer period is approved in writing by the Lessor, but no
guests may occupy the Apartment unless one or more of the
permitted adult residents are then in occupancy or unless
consented to in writing by the Lessor.

              (2)  Any non-individual Lessee shall not,
without the written consent of the Lessor on such conditions
as Lessor may prescribe, use the Apartment or permit the same
to be used for any purpose other than as a private dwelling
or for professional and ancillary business uses as permitted
by law.  Any use of the Apartment must conform to the terms
and conditions of the existing certificate of occupancy for
the Building and all applicable governmental and municipal
regulations and any other applicable laws or regulations.  In
the case of a Lessee that is a partnership, the right to oc-
cupy the Apartment, within the meaning of Section 216 of the

-13-

Internal Revenue Code of 1954, as amended, shall also inure
to the benefit of the partners of the partnership. Notwith-
standing the foregoing, any such non-individual Lessee,
whether or not a partnership, may occupy the Apartment only
by designating an individual to occupy the Apartment for the
purposes described above and on such terms and conditions as
is described below, unless such non-individual Lessee shall
obtain the prior written consent of the Lessor. Such desig-
nation shall be made in a partnership agreement, corporate
resolution, lease or other controlling document. Such Lessee
shall not, without the written consent of the Lessor on such
conditions as Lessor may prescribe, including but not limited
to those conditions provided in Paragraph 15 of this lease,
permit the Apartment or any part hereof to be occupied by
other than an individual designee of the Lessee, and his or
her spouse, their children, grandchildren, parents, grand-
parents, brothers and sisters and domestic employees and one
individual unrelated to the designee together with such per-
son's children. Such designee must be in occupancy of the
apartment for a period of not less than six months. Lessee
shall notify Lessor of the designation of an individual pur-
suant to the provisions of Paragraph 27 of this lease not
less than ten days before such individual takes occupancy.
Such designation shall be effective until Lessee designates a
different individual to take occupancy, but in no event less
than six months after any prior designation, unless such new
designation is consented to in writing by the Lessor. In
addition to the foregoing, the Apartment may be occupied from
time to time by guests of the Lessee or its designee for a
period of time not exceeding one month, unless a longer peri-
od is approved in writing by the Lessor, but no guests may
occupy the Apartment unless one or more of the permitted
adult residents are then in occupancy or unless consented to
in writing by the Lessor.

(3)  In addition to any other permitted
occupants, Lessee or the designee, as the case may be, shall
have the right to share the Apartment (if it is a residential
apartment) with one permanent companion of either sex, and
that companion's dependent children, for a period exceeding
one month, subject only to the requirements of law as to the
number of persons permitted in occupancy. No more than one
such companion shall occupy the apartment, regardless of
size, without the approval in writing by Lessor. The Lessor
shall allow the names on mailboxes and mail deliveries to be
made to such companion. The provisions of this subparagraph
(A)(3) shall not apply unless Lessee gives the name of such
companion and dependent children to Lessor within the greater
of 30 days after the date of this lease, or 30 days after the
date the companion occupies the Apartment. Lessee must at

-14-

the Building, and shall provide the Apartment with a proper
and sufficient supply of hot and cold water and of heat.  The
covenants by the Lessor herein contained are subject, how-
ever, to the discretionary power of the Directors to deter-
mine from time to time what services and what attendants
shall be proper and the manner of maintaining and operating
the Building, and also what existing services shall be in-
creased, reduced, changed, modified or terminated.

    Until all Unsold Shares have been sold to purchas-
ers for occupancy, the Lessor shall not eliminate or diminish
any existing services without the consent of the holders of
Unsold Shares.

Damage to Apartment or Building

    4.    (a)   If the Apartment or the means of access
thereto or the Building shall be damaged by fire or other
cause covered by multiperil policies commonly carried by
cooperative corporations in the New York City area (any other
damage to be repaired by Lessor or Lessee pursuant to Para-
graphs 2 and 18, as the case may be), the Lessor shall at its
own cost and expense, with reasonable dispatch after receipt
of notice of said damage, repair or replace or cause to be
repaired or replaced with materials of a kind and quality
then customary in buildings of the type of the Building, the
Building, the Apartment, and the means of access thereto,
including the walls, floors, ceilings, pipes, wiring and con-
duits in the Apartment.  Anything in this paragraph or Para-
graph 2 to the contrary notwithstanding, Lessor shall not be
required to repair or replace, or cause to be repaired or
replaced, equipment, fixtures, furniture, furnishings or
decorations installed by the Lessee or any of his or her pre-
decessors in interest nor shall the Lessor be obligated to
repaint or replace wallpaper or other decorations in Apart-
ments or to refinish floors or to repair or replace rugs,
carpets or other floor covering located therein.

Rent Abatement

        (b)   In case the damage resulting from fire or
other cause shall be so extensive as to render the Apartment
partly or wholly untenantable, or if the means of access
thereto shall be destroyed, the rent hereunder shall propor-
tionately abate until the Apartment shall again be rendered
wholly tenantable or the means of access restored; but if
said damage shall be caused by the act or negligence of the
Lessee or the agents, employees, guests or members of the
family of the Lessee or any occupant of the Apartment, such
rental shall abate only to the extent of the rental value

-5-

insurance, if any, collected by Lessor with respect to the
Apartment.

Expiration of Lease Due to Damage

        (c)   If the Directors shall determine that (i)
the Building is totally destroyed by fire or other cause, or
(ii) the Building is so damaged that it cannot be repaired
within a reasonable time after the loss shall have been ad-
justed with the insurance carriers, or (iii) the destruction
or damage was caused by hazards which are not covered under
the Lessor's insurance policies then in effect, and if in any
such case the record holders of at least two-thirds of the
outstanding shares at the shareholders' meeting duly called
for that purpose held within 120 days after the determination
by the Directors, shall vote not to repair, restore or re-
build, then upon the giving of notice pursuant to Paragraph
31 hereof, this lease and all other Proprietary Leases and
all right, title and interest of the parties thereunder and
the tenancies thereby created, shall hereupon wholly cease
and expire and rent shall be paid to the date of such de-
struction or damage.  The Lessee hereby waives any and all
rights under Section 227 of the Real Property Law and in no
event shall the Lessee have any option or right to terminate
this lease except as provided herein.

Waiver of Subrogation

        (d)   Lessor agrees to use its best efforts to
obtain a provision in all insurance policies carried by it
waiving the right of subrogation against the Lessee; and, to
the extent that any loss or damage is covered by the Lessor
by any insurance policies which contain such waiver of subro-
gation, the Lessor releases the Lessee from any liability
with respect to such loss or damage.  In the event that Les-
sor suffers loss or damage for which Lessor would be liable,
and Lessee carries insurance which covers such loss or damage
and such insurance policy or policies contain a waiver of
subrogation against the Lessor, then in such event Lessee
releases Lessor from any liability with respect to such loss
or damage.

Inspection of Books of Account; Annual Report

        5.   The Lessor shall keep full and correct books
of account at its principal office or at such other place as
the Directors may from time to time determine, and the same
shall be open during all reasonable hours to inspection by
the Lessee or a representative of the Lessee.  The Lessor
shall deliver to the Lessee within three months after the end

-6-

all times continue to reside in the Apartment with the companion.

B.  Notwithstanding the foregoing, a Lessee who was a tenant in occupancy on the date the Offering Plan was accepted for filing by the Attorney General, and who purchased the shares allocated to his or her apartment within any exclusive period provided in the Plan for a tenant to purchase the shares allocated to his or her apartment, may continue to use the Apartment to maintain a business or professional practice so long as the Lessee faithfully and strictly adheres to the following terms and conditions:

(1)  The use must have been (i) extant on the date that the preliminary proposed "Red Herring" Offering Plan was served on the tenants in occupancy of the Property, or (ii) otherwise consented to by Lessor.

(2)  The use is not violative of law or the Certificate of Occupancy or of any building code or other rule, regulation or promulgation of any government authority having jurisdiction.

(3)  The right to continue such use may be transferred with the Apartment, but shall only continue for so long as the Apartment is continuously used for such business or professional practice, and such use shall not be permitted (except as may be otherwise permitted by Lessor in accordance with this lease) after any interruption in such use (i.e., after the Apartment is used for any other purpose).

(4)  The use may not materially affect the character of the Building, damage or burden the Apartment Corporation's property or disturb the Building's other Lessees in the peaceful use of their apartments.

(5)  Notwithstanding the other provisions of this subparagraph 14B if Lessee is a holder of Unsold Shares, then Lessee may require Lessor to allow the maintenance of a business or professional practice in the Apartment by Lessee, its tenants or subtenants and/or the immediate assignee from Lessee, provided that Lessee (or Lessee's immediate assignee, as the case may be) faithfully and strictly adheres to the following terms and conditions:  (a) the use is not violative of law or the Certificate of Occupancy or of any building code or other rule, regulation or promulgation of any government authority having jurisdiction; (b) the right to continue such use, once permitted pursuant to this subsection, may be transferred with the Apartment, but shall

-15-

only continue for so long as the Apartment is continuously
used for such business or professional practice, and such use
shall not be permitted (except as may be otherwise permitted
by Lessor in accordance with this lease) after any interrup-
tion in such use (i.e., after the Apartment is used for any
other purpose); and (c) the use may not materially affect the
character of the Building, damage or burden the Apartment
Corporation's property or disturb other Lessees and the
peaceful use of their apartments.

        For purposes of this Paragraph 14, "individual"
shall mean a natural person over 18 years of age and other-
wise legally competent.

        C. (1) Notwithstanding the provisions of
subparagraphs 14A or 14B or Paragraph 21 to the contrary, if
the Apartment is one which (i) the Certificate of Occupancy
for the Building permits use of as a doctor's office or other
professional purposes or (ii) has been used as a doctor's
office or for other professional purposes as of the date on
which the Plan was accepted for filing (regardless of the use
thereof permitted by the Certificate of Occupancy for, the
Building) or (iii) could lawfully be used as a doctor's
office or for other professional purposes under applicable
law and regulations (regardless of the use thereof permitted
by the Certificate of Occupancy of the Building), then Lessee
shall have the absolute right, at Lessee's sole cost and
expense, at any time, to take the necessary steps to lawfully
convert the Apartment to lawful residential use and in such
event, the provisions of this subparagraph 14C shall no
longer apply. In accordance therewith, Lessee may secure an
amendment to the Certificate of Occupancy which would permit
residential use by filing documentation with the appropriate
municipal authorities and performing any necessary altera-
tions to the Apartment, both at the Lessee's sole expense.
However, any such filing of documentation or performance of
alterations shall be subject to the prior written consent of
Lessor, which consent shall not be unreasonably withheld.
Subject to Lessor's right to withhold its consent to the
foregoing on reasonable grounds (including, but not limited
to, reasonable grounds with respect to the documentation to
be submitted in order to amend the Certificate of Occupancy,
the adequacy of any such amendment, the nature of the pro-
posed alterations to the Apartment and the quality of said
alterations), provided that such grounds shall not relate to
the nature of the use of the Apartment, Lessor shall execute
any and all documentation reasonably required in connection
with any such amendment to the Certificate of Occupancy or
any such alterations to the Apartment made by Lessee, includ-

-16-

ing, but not limited to, a bond, indemnification or altera-
tion agreement.

   (2) In addition to the provisions of
subparagraph 14C(1), if the Apartment is used as a doctor's
office or for other professional purposes which are not auth-
orized by the Certificate of Occupancy as of the date of
filing of the Plan, and in the event Lessee uses the Apart-
ment for such purposes, Lessee shall discontinue such use un-
til such time as Lessee has secured, if available, an amend-
ment to the Certificate of Occupancy which would permit such
use by filing documentation with the appropriate municipal
authorities and performing any necessary alterations to the
Apartment, both at Lessee's sole expense, provided that any
such filing or documentation or performance of alterations
shall be subject to the prior written consent of Lessor,
which consent shall not be unreasonably withheld.  Subject to
Lessor's right to withhold its consent to the foregoing on
reasonable grounds (including, but not limited to, reasonable
grounds with respect to the documentation to be submitted in
order to amend the Certificate of Occupancy, the adequacy of
any such amendment, the nature of the proposed alterations to
the Apartment and the quality of said alterations), provided
that such grounds shall not relate to the nature of the use
of the Apartment, Lessor shall execute any and all documenta-
tion reasonably required in connection with any such amend-
ment to the Certificate of Occupancy or any such alterations
to the Apartment to be made by Lessee.

   (3) Notwithstanding the foregoing provi-
sions of this subparagraph 14C, if Lessee is a holder of Un-
sold Shares, then there shall be no requirement for the prior
written consent of Lessor in order for Lessee to (i) file
documentation with municipal authorities and/or (ii) perform
reasonable alterations to the Apartment which are necessary
to secure an amendment to the Certificate of Occupancy of the
Building, and Lessor shall execute any and all documentation
reasonably required in connection with any such amendment to
the Certificate of Occupancy or any such alterations to the
Apartment to be made by the Lessee.

   (4) Nothing in this Paragraph 14 shall
be deemed to permit, suffer or allow use of the Apartment by
Lessee in violation of the use thereof permitted by the Cer-
tificate of Occupancy.

  D. Development Rights

   Notwithstanding Paragraphs 14 or 21 or any other
provisions of this lease, if Lessee is the Lessee of Apart-

-17-

ment PH-B in 434 East 52nd Street, then Lessee shall have a
right, including whatever easements might be required, to add
to the existing building in which the Apartment is located
either additional apartments or expansions of any penthouse
or top floor apartments in the building in which the
Apartment is located within any air, zoning or development
rights, including, but not limited to, areas including
transferable development rights (all of which such rights and
the rights conferred to Lessee pursuant to this paragraph are
referred to as "Development Rights"). Such a Lessee who
holds Development Rights shall have the following rights set
forth in this paragraph. It is understood that any
structural improvements or improvements to the common areas
of the building created pursuant to the exercise of the
Development Rights would become a part of the Building and
upon completion of construction would be owned and maintained
by Lessor and that any other improvements to an individual
apartment would become a part of the Apartment upon comple-
tion of construction and, except as set forth in this lease,
would be the responsibility of the Lessee of the particular
apartment.

Generally, implementation of the Development Rights
pursuant to this section would be for any lawful purpose, and
particularly the following:

1.   To improve, expand, combine or reconfigure any
portion of the roof that comprises the Building in which the
Lessee's Apartment is located;

2.   To improve, expand, reconfigure, provide ac-
cess to or add on to the penthouses situated in the Building;
and

3.   To increase the height or depth, or otherwise
enlarge or increase the usable floor area of the Building, or
to create any additional Apartments.

Lessor hereby grants Lessee such easements as
Lessee shall reasonably require in order to exercise its
rights hereunder, including, but not limited to, such ease-
ments to any newly constructed, installed or extended utility
services and facilities, the elevators, machine rooms, the
water tanks, stairs or roof extensions that might not other-
wise be owned by Lessor, use of elevators and common areas of
the Building for transport of workmen, equipment and materi-
als and use of common areas allocable to an Apartment which
has access to an area in which work is being performed (sub-
ject to an agreement with the Lessee of that Apartment). Ac-
cordingly, Lessor shall permit and grant an easement for any

-18-

work which the Lessee shall elect to perform in connection
with the exercise of the Development Rights, provided that
such work is undertaken in accordance with the requirements
of all relevant laws and governmental agencies.  Thus, for
example, without limiting the generality of the foregoing,
Lessee shall have the rights, with respect only to the exer-
cise of the Development Rights, to:

       (i)   Alter, repair, replace and/or relocate
the exterior walls of the Building;

       (ii)   Alter the walls, floors and ceilings of
Apartments and alter and/or construct stairs within the
Apartments;

       (iii)   Renovate, reconfigure, and expand the
entrance envelope of any affected space;

       (iv)   Relocate machinery, plumbing or elec-
trical fixtures, flues, risers, lines, branches, house tanks
and roof fans (including permanent penetration of public
areas);

       (v)   Automate and modernize the service
elevators, redecorate the service elevator access corridors
and extend upward the passenger elevators and/or service
elevators;

       (vi)   Close off one or more stairway exits on
any roof and/or extend exterior stairs on the roof exten-
sions;

       (vii)   Relocate points of egress on the roof;

       (viii)   Construct or install chimneys, HVAC
equipment and/or other amenities and connect same to Building
machinery, plumbing, electrical systems, intercom and cable
television systems;

       (ix)   Provide access to building facilities and
services, including mailboxes, Building directory and other
residential amenities;

       (x)   Modify any Building system to increase
capacity thereof in order to accommodate new space;

       (xi)   Install jacuzzis, clothes washers and
dryers, dishwashers and other appliances;

-19-

(xii)   Afford workers necessary access to
elevators, stairs and Building facilities during customary
industry practice construction hours;

(xiii)   Maintain roll-off refuse containers at
the Building;

(xiv)   Store and maintain tools and materials in
the Building;

(xv)   Use building employee locker room and
bathroom facilities;

(xvi)   Connect to, with, relocate, replace, use
and/or increase the capacities of and draw from the Build-
ing's electricity, water and other utility service and
facilities;

(xvii)   Remove parapets and install fencing,
railings or the like;

(xviii)   Extend any fire escape to a new roof of
the additions;

(xix)   Connect with, relocate, remove and extend
existing structural systems at the roof level or below in
order to provide to the Building the necessary structural
support for the expansion of the building;

(xx)   Combine the space referred to herein with
any top floor apartment space in any manner in the sole
discretion of the Lessee; and

(xxi)   Compel Lessor to facilitate (to the full-
est extent permitted under any applicable Proprietary Lease)
penetration and entry to apartments to permit the extension
and provision of Building services and systems to the space
under construction.

In connection with the exercise of the Development
Rights under this paragraph, Lessee shall be obligated to
take reasonable steps to advise Lessor of work to be under-
taken and shall be obligated to make reasonable efforts to
minimize inconvenience to residents of the Building occa-
sioned by the performance of such work.  Accordingly:

(i)   Construction work shall only be performed
between the hours of 8:00 a.m and 6:00 p.m. on Monday through
Friday, and no work will be done on weekends or holidays, or
on an overtime basis except for emergency repairs resulting

-20-

from circumstances beyond the Lessee's control due to unfore-
seen conditions, or work on the interiors of Apartments that
does not affect other Building services or create unusual
noise or other disturbance to other occupants in the
Building;

      (ii)   Lessee will post written notices in prom-
inent places throughout the Building in which the apartment
is located at least 24 hours before the water, heat, gas,
electricity or elevator service in the Building may be
temporarily turned off in connection with construction, and
Lessee shall restore such service as soon as is reasonably
possible on the same day;

      (iii)   Lessee will be responsible for any break-
age or damage to property of Lessor or personal property of
other persons in the Building that is damaged by Lessee or
its workmen because of the work performed in the exercise of
the Development Rights;

      (iv)   Refuse from the work shall be disposed of
at the sole cost and expense of the Lessee and shall be taken
from the Building and placed in separate dumpsters or bins
which may be maintained in the front of any Building with all
such debris and refuse to be disposed of at the sole cost and
expense of the Lessee on a weekly basis; however, public
areas of the Building shall be policed and cleared by the
Lessee's workmen at the end of each work day and storage of
construction material will be limited to the rear courtyard
and on the existing roof, and other than deliveries, no
material will be allowed to remain anywhere on 52nd Street,
except in the dumpster or bin or other appropriate rubbish
container for debris;

      (v)   Lessee shall maintain strict supervision
at all times to minimize the inconvenience to other Proprie-
tary Lessees in the Building, and if any doors to the Build-
ing which would otherwise be locked are to be left open and
unattended because of the work, the Lessee will, at its sole
cost and expense, have a watchman or other employee guard
that entrance while it is left open; and

      (vi)   Although Lessor agrees that workmen en-
gaged in the work to be performed pursuant to the exercise of
the Development Rights may use the elevators, Lessee agrees
that such elevators will be made available on a regular basis
for the collection of garbage or other regular Building ser-
vices as reasonably may be appropriate.

In connection with any construction to be performed
pursuant to this paragraph, during the pendency of such con-
struction Lessor shall be obligated to carry comprehensive
general liabiity damage insurance with an umbrella of at
least $1 million with Lessor as a named insured, together
with Lessee as their respective interests may appear.

Any new Apartment that may be created pursuant to
the exercise of the Development Rights may be used for any
lawful purposes, provided that the Certificate of Occupancy
will so provide, and Lessee may amend, and Lessor shall
cooperate with Lessee in such connection, the Certificate of
Occupancy to indicate the use and number of Apartments after
the completion of construction; when a Certificate of Occu-
pancy is issued with respect to any new space that is issued
pursuant to the exercise of the Development Rights, Lessor
shall be obligated to issue and allocate to such space,
whether it is the expansion of an existing Apartment or a new
Apartment, such number of shares as Lessee shall direct,
provided that Lessee shall obtain the written opinion of a
real estate expert selected by Lessee that such allocation
bears a reasonable relationship to the portion of the fair
market value of Lessor's equity in the property which is
attributable to the new Apartment (or such new space) and
such opinion shall be conclusive and binding on Lessor; and
Lessor shall also be obligated to issue a Proprietary Lease
for such new space or, in the event that an existing
Apartment has been expanded, to amend or issue a new
Proprietary Lease for such apartment.

Lessor, and by execution of the Proprietary Lease,
all Proprietary Lessees of the Lessor, agree to cooperate
with the Lessee who holds the Development Rights in connec-
tion with the implementation of those rights, including, but
not limited to, cooperation in the execution of all documen-
tation, applications and consents required by the appropriate
governmental authorities, any amendment to the Certificate of
Incorporation or other acts as may be necessary in connection
with the issuance of shares and Proprietary Leases allocated
to such space.

Lessee is hereby granted an irrevocable power of
attorney, coupled with an interest, with full power of
substitution, as the attorney-in-fact of Lessor and each
Proprietary Lessee of Lessor, from time to time in their
name, place and stead to:

(i) Execute and/or record and/or file any
documentation required in connection with the exercise or

-22-

implementation of the Development Rights or as contemplated
herein;

       (ii)  Establish of record any easements granted
to Lessee herein;

       (iii)  Take any other action that may be neces-
sary to effectuate the Development Rights and the require-
ments and rights of this paragraph, including, but not
limited to, amendment of the Certificate of Occupancy for the
Building in which Lessee's apartment is located to incorpo-
rate any apartments that may be created, or to issue shares
and Proprietary Leases to any new apartments or to any exist-
ing Apartments which are expanded pursuant to the exercise of
the Development Rights.  In any event, the Lessee will bear
all costs and expenses involved in the foregoing and in the
exercise of the Development Rights, and hereby indemnifies
Lessor and all Proprietary Lessees of Lessor against all lia-
bility arising from the costs and expenses of the performance
of work by Lessee pursuant to the exercise of the Development
Rights under this paragraph, providing that Lessor and all
Lessees in Lessor, as the case may be, perform their obliga-
tions pursuant to this paragraph.

       Any construction pursuant to the foregoing must be
commenced no later than the third anniversary of the com-
mencement date of this lease.

Subletting

       15.  (a)  Except as provided in Paragraph 38 of
this lease, and in subparagraph (b) below, the Lessee shall
not sublet the whole or any part of the Apartment or renew or
extend any previously authorized sublease, unless consent
thereto shall have been duly authorized by a resolution of
the Directors, or given in writing by the majority of the
Directors or, if the Directors shall have failed or refused
to give such consent.within thirty (30) days after submission
of references to them or the Managing Agent and after comple-
tion of all applications, then by Lessees owning at least
two-thirds of the then-issued shares or the Lessor.  Consent
by Lessees as provided for herein shall be evidenced by writ-
ten consent or by affirmative vote taken at a meeting called
for such purpose.  Any consent to subletting may be subject
to such conditions as the Directors or Lessees, as the case
may be, may impose.  There shall be no limitation on the
right of Directors or Lessees to grant or withhold consent to
a subletting for any or no reason, except as limited or pro-
scribed by law.  No consent to subletting shall operate to
release the Lessee from any obligation hereunder.

-23-

(b)  Notwithstanding the foregoing, no consent
to sublet shall be required if Lessee (1) was assigned this
lease and acquired the appurtenant shares of stock directly
from either Sponsor or Lessor pursuant to the Offering Plan,
(2) has never sublet the Apartment before, (3) enters into a
sublease for a period not to exceed three years with no right
of renewal, and (4) resides in the Building.  However, in the
event the subtenant (1) was formerly a residential tenant of
the Apartment on the date the Offering Plan was accepted for
filing, (2) subscribed to purchase pursuant to the Offering
Plan, and (3) assigned his or her rights under a subscription
agreement to Lessee, there shall be no limit on the length of
the sublease, nor the number of times it may be renewed.

(c)  Notwithstanding the foregoing, if the
Apartment described herein is listed on the Certificate of
Occupancy for the Building as a "doctor's office," if Lessee
is the initial subscriber under the Plan or a purchaser of
the shares allocated to the Apartment directly from a holder
of Unsold Shares (as described in Paragraph 38 hereof),
Lessee may sublet part, but not all, of the Apartment, to
other licensed doctors, dentists or osteopaths for use as a
medical office (except for the practice of veterinary
medicine or a practice specializing in abortions), including
the practice of medicine, dentistry, or osteopathy ("Medical
Office") without obtaining the consent of the directors, or
the Corporation.

If Lessee did not acquire the shares allocated
to the Apartment as a subscriber under the Plan or directly
from a holder of Unsold Shares, Lessee may sublet part, but
not all, of the Apartment to other licensed doctors, dentists
or osteopaths as a Medical Office subject to the consent of
the Board of Directors, which consent may not be unreasonably
withheld or delayed, such that if the Directors fail to de-
liver a response to a written request to sublet (which meets
the criteria set forth below) within twenty days after re-
ceipt thereof by the Managing Agent of the Building, such
request shall be deemed granted.  (For the purposes of the
foregoing sentence, it shall not be deemed to be unreasonable
for the Board of Directors to withhold consent because of an
intended use of the office for a specialist in radiology, the
practice of veterinary medicine or a practice specializing in
abortions.)

Such written requests to sublet must meet the
following conditions to the reasonable satisfaction of the
Directors:

-24-

(i)    Lessee shall continue to actively use not less than 25% of the floor area of the Apartment for Lessee's own professional use as above described;

(ii)    The proposed sublessee shall not use the Apartment during other than the normal business hours of the Lessee;

(iii)    The proposed sublessee shall be a licensed doctor, dentist or osteopath and use the Apartment for professional medical purposes in a similar manner (but not necessarily for the practice of the same medical specialty) to that of Lessee;

(iv)    The proposed sublease shall be expressly subject to the provisions of this lease;

(v)    The proposed sublessee shall at all times be in full compliance with the terms and conditions of Paragraphs 7, 11, 13, 14, 18, 20, 21, 23, 24, 25, 29, 30, and this Paragraph 15 of this lease in the same manner and to the same extent that Lessee is required to be in compliance; and to the extent sublessee is not in compliance with such terms and conditions, the Lessor may take any action it deems appropriate against the sublessee, Lessee, or both of them, it being understood that Lessee shall be liable for any breach of the terms and conditions of this lease by a sublessee in the same manner and to the same extent, that Lessee would be liable if such Lessee were in breach of such terms and conditions;

(vi)    The sublessee shall meet the same criterion with respect to good character and financial responsibility that would be required by the Directors for a proposed assignee of this lease for the Apartment; however, the proposed sublessee shall not be required to meet any other requirement for approval of the Directors, including, but not limited to, amount of assets or income;

(vii)    The sublessee may not further sublet the Apartment; and

(viii)    Nothing in the foregoing shall be deemed to limit or restrict the obligations of the Lessee to any tenant pursuant to a lease for the Apartment that is in place as of the date of commencement of this lease.

16.    (a)    Except as provided in Paragraph 38, the Lessee shall not assign this lease or transfer the shares to which it is appurtenant or any interest therein, and no such

-25-

assignment or transfer shall take effect as against the
Lessor for any purpose, until:

       (i)  an instrument of assignment in form
approved by the Lessor executed and acknowledged by the
assignor shall be delivered to the Lessor; and

       (ii)  an agreement executed and
acknowledged by the assignee in form approved by Lessor
assuming and agreeing to be bound by all the covenants and
conditions of this lease to be performed or complied with by
the Lessee on and after the effective date of said assignment
shall have been delivered to the Lessor, or, at the request
of the Lessor, the assignee shall have surrendered the
assigned lease and entered into a new lease in the same form
for the remainder of the term, in which case the Lessee's
lease shall be deemed cancelled as of the effective date of
said assignment; and

       (iii)  all shares of the Lessor to which
this lease is appurtenant shall have been transferred to the
assignee, with proper transfer taxes paid and stamps affixed;
and

       (iv)  all sums due from the Lessee,
including the payment of any transfer fee provided for in the
By-Laws of Lessor, shall have been paid to the Lessor,
together with a sum to be fixed by the Directors as permitted
by the By-Laws to cover reasonable legal and other expenses
of the Lessor and its Managing Agent in connection with such
assignment and transfer of shares; and

       (v)  a satisfactory search or
certification from a title or abstract company as the
Directors may require shall be delivered to Lessor; and

       (vi)  except in the case of an assignment
if Lessee was assigned this lease and acquired the
appurtenant shares of stock directly from either Lessor or
Sponsor pursuant to the Offering Plan and resides in the
Apartment on the date hereof, or in the case of an assign-
ment, transfer or bequest to the Lessee's spouse of the
shares and this lease, consent to such assignment shall have
been authorized by resolution of the Directors, or given in
writing by a majority of the Directors; or, if the Directors
shall have failed or refused to give such consent within 30
days after submission of references to them or Lessor's agent
and completion of all applications, then by Lessees owning of
record at least two-thirds of the then-issued and outstanding
shares of the Lessor.  Consent by Lessees as provided for

-26-

herein shall be evidenced by written consent or by
affirmative vote taken at a meeting duly called for such
purpose in the manner as provided in the By-Laws; and

(vii) if the Lessee's shares are allocated
to an Apartment occupied by a non-purchasing tenant (as de-
fined in Paragraph 8), then, on or before the date of an
assignment or other change in ownership of the shares, there
is sent to the non-purchasing tenant by personal delivery or
certified mail, return receipt requested, a notice signed by
the assignor and assignee in the case of an assignment, or
the new owner, addressed to the non-purchasing tenant at the
Building (or at such other address as the non-purchasing
tenant may indicate by written notice to the Managing Agent)
advising the non-purchasing tenant that ownership of the
shares allocated to the Apartment is to be (or has been)
transferred, and containing the name and address of the
assignee or new owner and the effective date of the transfer
of ownership.

Consents:  On Death of Lessee

(b)  If the Lessee shall die, consent shall
not be unreasonably withheld to an assignment of the lease
and shares to a financially responsible member of the Les-
see's family (other than the Lessee's spouse as to whom no
consent is required).

Consents Generally:  Stockholder's and
Directors' Obligations to Consent

(c)  There shall be no limitation, except as
above specifically provided, on the right of Directors or
Lessees to grant or withhold consent, to an assignment for
any reason or for no reason, except as required by law.

Release of Lessee Upon Assignment

(d)  If the lease shall be assigned in com-
pliance herewith, the Lessee-assignor shall have no further
liability on any of the covenants of this lease to be there-
after performed.

Further Assignment or Subletting

(e)  Regardless of any prior consent thereto-
fore given, neither the Lessee nor his or her executor, nor
administrator, nor any trustee or receiver of the property of
the Lessee, nor anyone to whom the interests of the Lessee
shall pass by law, shall be entitled further to assign this

-27-

lease, or to sublet the Apartment, or any part thereof,
except upon compliance with the requirements of this lease.

Involuntary Transferee

(f)  Neither the executor nor the administra-
tor, nor any trustee or receiver of the property of the Les-
see, nor any person to whom the interests of Lessee shall
pass by law, shall be entitled to occupy the Apartment nor to
assign this lease nor to sublet the Apartment or any part
thereof, except upon compliance with the requirements of this
lease.

Statement by Lessor

(g)  If this lease is then in force and ef-
fect, Lessor will, upon request of Lessee, deliver to the
assignee a written statement to that effect but no such
statement shall be deemed an admission that there is no de-
fault under the lease.

Fees on Assignment

(h)  (i)  The Board of Directors may require
that, except as limited pursuant to Paragraph 38, any
subletting or assignment of this lease shall only take effect
against Lessor after and shall otherwise be deemed void and
of no effect until the Lessee has paid certain fees as
permitted by the By-Laws of Lessor, and in addition, in the
case of an assignment pursuant to a sale of shares, after the
Lessee has paid as a special transfer fee an amount
established by the Directors to be not greater than $25.00
for each share of Lessor owned by Lessee.  Any such fee shall
be subject to confirmation by a vote of a majority of share-
holders of Lessor.

(ii)  Notwithstanding the foregoing, the
following sales of shares (and assignments of leases) shall
be exempt from the imposition and payment of any such special
transfer fee:  (a) sales of shares by the seller to his
children, grandchildren, parents, grandparents, adult
siblings or spouse, provided that the consideration received
by the seller in such sales does not exceed the original
purchase price paid by such seller; (b) sales of shares, for
no consideration, that are effected by the operation of a
will or by intestate distribution; (c) any sales of shares to
or by Raynes Associates Limited Partnership or any successor
thereof, or to or by holders of Unsold Shares, for any or no
consideration, or any sales of shares that are Unsold Shares;
(d) sales of shares in connection with any recapitalization

-28-

or reorganization of the Lessor; (e) acquisition or sales of
shares in accordance with a pledge or security agreement
affecting such shares, following a default under such pledge
or security agreement, including any "Alternative Purchase
Plan" security agreement; (f) sales of shares by a seller
who, immediately prior to or following such sale, acquires
the shares allocated to another apartment at the Property for
use as his residence; and (g) sales of shares within five (5)
years after the date on which the initial conveyance of the
Property to Lessor took place.  If at any time in the future,
the exemptions from the Special Transfer Fee described in
"(c)" above are invalidated, no Special Transfer Fee shall be
imposed on the sale of any shares of the Lessor.

No Waiver

      (i)  The restrictions on the assignment of
this lease, as hereinbefore set forth, are a special con-
sideration and inducement for the granting of this lease by
the Lessor to the Lessee.  No demand or acceptance of rent
from any assignee hereof shall constitute or be deemed to
constitute a consent to or approval of any assignment.

Duty of Lessor

      (j)  At such time as the conditions of this
paragraph have been met, and any required consent has been
given, the Lessor shall be obligated to fully and promptly
cooperate with Lessee, and cause its Managing Agent (if any)
to similarly cooperate with Lessee, to effectuate the assign-
ment of this lease and the transfer of the appurtenant
shares.

Pledge of Shares and Lease

      17.  (a)  A pledge of this lease and the shares to
which it is appurtenant shall not be a violation of this
lease; but neither the pledgee nor any transferee of the
pledged security shall be entitled to have the shares trans-
ferred of record on the books of the Lessor, nor to vote such
shares nor to sell such shares or assign this lease without
first obtaining the consent of the Lessor in accordance with
and after complying with all of the provisions of Paragraphs
14, 15 or 16, as the case may be (i.e., notwithstanding any
apparent authority granted to any such pledgee or lender pur-
suant to any other agreements with Lessor or Lessee, such
pledgee or lender shall have no right or power to transfer
this lease or the shares allocated to the Apartment upon
foreclosure or otherwise either to such pledgee or lender or
to any other person without the approvals required by this

lease).  The acceptance by Lessor of payments by the pledgee
or any transferee of the pledged security on account of rent
or additional rent shall not constitute a waiver of the
aforesaid provisions or of the provisions of this paragraph.

(b)  Subject to the provisions of subparagraph
(a) above, the Lessor will enter into an agreement with the
lender providing for the pledge of this lease (and the appur-
tenant shares of the Lessor) as security for the loan (i) on
the terms contained in the Aztech form of Recognition Agree-
ment (copyright 1973), or (ii) with respect to Unsold Shares,
in the form set forth in the Offering Plan, as amended, or
(iii) in the discretion of Lessor, in any form substantially
similar to the Aztech form of Recognition Agreement then
being used by banks in New York City and on such other terms
which the lender and the Lessor, in their discretion, may
agree to for the protection of their respective interests.

(c)  Except as provided in Paragraph 38 of
this lease, no loan may exceed the maximum fixed by the Board
of Directors of Lessor.

Repairs by the Lessee

18.  (a)  The Lessee shall take possession of the
Apartment and its appurtenances and fixtures "as is" as of
the commencement of the term hereof.  Subject to the provi-
sions of Paragraph 4 above, the Lessee shall keep the inte-
rior of the Apartment (including interior walls, floors and
ceilings, but excluding windows, window panes, window frames,
sashes, sills, entrance and terrace doors, frames and sad-
dles) in good repair, shall do all of the painting and decor-
ating required for his or her Apartment, including the inter-
ior of window frames, sashes and sills, and shall be solely
responsible for the maintenance, repair, and replacement of
plumbing, gas and heating fixtures and equipment and such
refrigerators, dishwashers, removable and through-the-wall
air conditioners, washing machines, ranges and other appli-
ances, as may be in the Apartment.  Plumbing, gas and heating
fixtures as used herein shall include exposed gas, steam and
water pipes attached to fixtures, appliances and equipment to
which they are attached, and any special pipes or equipment
which the Lessee may install within the wall or ceiling, or
under the floor, but shall not include gas, steam, water or
other pipes or conduits within the walls, ceiling or floors
or air-conditioning or heating equipment which is part of the
standard building equipment.  The Lessee shall be solely re-
sponsible for the maintenance, repair and replacement of all
lighting and electrical fixtures, appliances and equipment,
and all meters, fuse boxes or circuit breakers and electrical

-30-

wiring and conduits from the junction box at the riser into
and through the Lessee's Apartment. Any ventilator or air-
conditioning device which shall be visible from the outside
of the Building shall at all times be painted by the Lessee
in a standard color which the Lessor may select for the
Building. Lessee shall be solely responsible for the maint-
enance, repair and replacement of doors leading from the
Apartment to any maid's room, penthouse, terrace or balcony.

Odors and Noises

(b) The Lessee shall not permit unreasonable
cooking or other odors to escape into the Building. The Les-
see shall not permit or suffer any unreasonable noise or any-
thing which will interfere with the rights of other Lessees
or unreasonably annoy them or obstruct the public halls or
stairways.

Equipment and Appliances

(c) If, in the Lessor's sole judgment, any of
the Lessee's equipment or appliances shall result in damage
to the Building, or poor quality or interruption of service
to other portions of the Building, or overloading of, or dam-
age to facilities maintained by the Lessor for the supplying
of water, gas, electricity or air-conditioning to the Build-
ing, or if any such appliances visible from the outside of
the Building shall become rusty or discolored, the Lessee
shall promptly, on notice from the Lessor, remedy the condi-
tion and, pending such remedy, shall cease using any appli-
ance or equipment which may be creating the objectionable
condition.

Rules and Regulations and Requirements of Mortgage

(d) The Lessee will comply with all the re-
quirements of the Board of Fire Underwriters, insurance au-
thorities and all governmental authorities and with all laws,
ordinances, rules and regulations with respect to the occu-
pancy or use of the Apartment. If any mortgage affecting the
land or the Building shall contain any provisions pertaining
to the right of the Lessee to make changes or alterations in
the Apartment, or to remove any of the fixtures, appliances,
equipment or installations, the Lessee herein shall comply
with the requirements of such mortgage or mortgages relating
thereto. Upon the Lessee's written request, Lessor will fur-
nish Lessee with copies of applicable provisions of each and
every such mortgage.

-31-

Lessor's Right to Remedy Lessee's Defaults

19.   If the Lessee shall fail for 30 days after
notice to make repairs to any part of the Apartment, its fix-
tures or equipment as herein requested, or shall fail to
remedy a condition which has become objectionable to the
Lessor for reasons above set forth or if the Lessee or any
person dwelling in the Apartment shall request the Lessor,
its agents or servants to perform any act not hereby required
to be performed by the Lessor, the Lessor may make such re-
pairs, or arrange for others to do the same, or remove such
objectionable condition or equipment, or perform such act,
without liability on the Lessor; provided that, if the condi-
tion requires prompt action, notice of less than 30 days may
be given or, in case of emergency, no notice need be given.
In all such cases the Lessor, its agents, servants and con-
tractors shall, as between the Lessor and the Lessee, be con-
clusively deemed to be acting as agents of the Lessee and all
contracts therefor made by the Lessor shall be so construed
whether or not made in the name of the Lessee.   If Lessee
shall fail to perform or comply with any of the other coven-
ants or provisions of this lease within the time required by
a notice from Lessor (not less than 5 days), then Lessor may,
but shall not be obligated to, comply herewith, and for such
purposes may enter upon the Apartment of Lessee.   The Lessor
shall be entitled to recover from the Lessee all expenses in-
curred or for which it has contracted hereunder, such ex-
penses to be payable by the Lessee on demand as additional
rent.

Increase in Rate of Fire Insurance

20.   The Lessee shall not permit or suffer anything
to be done or kept in the Apartment which will increase the
rate of fire insurance on the Building or the contents there-
of.   If, by reason of the occupancy or use of the Apartment
by the Lessee, the rate of fire insurance on the Building or
an Apartment or the contents of either shall be increased,
the Lessee shall (if such occupancy or use continues for more
than 10 days after written notice from the Lessor specifying
the objectionable occupancy or use) become personally liable
for the additional insurance premiums incurred by the Lessor
or any Lessee or Lessees of Apartments in the Building on all
policies so affected, and the Lessor shall have the right to
collect the same for its benefit or the benefit of any such
Lessees as additional rent for the Apartment due on the first
day of the calendar month following written demand therefor
by the Lessor.

-32-

Alterations

        21.    Except as provided in Paragraph 38 hereof:

                (a)    The Lessee shall not, without first ob-
taining the written consent of the Lessor, which consent
shall not be unreasonably withheld or delayed, make in the
Apartment or Building, or on any roof, penthouse, terrace or
balcony appurtenant thereto, any alteration, enclosure or
addition or any alteration of or addition to the water, gas,
or steam risers or pipes, heating or air-conditioning system
or units, electrical conduits, wiring or outlets, plumbing
fixtures, intercommunication or alarm system, or any other
installation or facility in the Apartment or the Building.
The performance by Lessee of any work in the Apartment shall
be in accordance with any applicable rules and regulations of
the Lessor and governmental agencies having jurisdiction
thereof and may not impinge on common areas of the Building
without Lessor's consent.  The Lessee shall not in any case
install any appliances which will overload the existing wires
or equipment in the Building.

Removal of Fixtures

                (b)    Without Lessor's prior written consent,
the Lessee shall not remove any fixtures, appliances, addi-
tions or improvements from the Apartment except as herein-
after provided.  If the Lessee, or a prior Lessee, shall have
heretofore placed, or the Lessee shall hereafter place in the
Apartment, at the Lessee's own expense, any additions, im-
provements, appliances or fixtures, including but not limited
to fireplace mantels, lighting fixtures, refrigerators, air
conditioners, dishwashers, washing machines, ranges, wood-
work, wall paneling, ceilings, special doors or decorations,
special cabinet work, special stair railings or other built-
in ornamental items, which can be removed without structural
alterations or permanent damage to the Apartment, then title
thereto shall remain in the Lessee and the Lessee shall have
the right, prior to the termination of this lease, to remove
the same at the Lessee's own expense, provided:  (i) that the
Lessee at the time of such removal shall not be in default in
the payment of rent or in the performance or observance of
any other covenants or conditions of this lease; (ii) that
the Lessee shall, at the Lessee's own expense, prior to the
termination of this lease, repair all damage to the Apartment
which shall have been caused by either the installation or
removal of any of such additions, improvements, appliances or
fixtures; (iii) that, if the Lessee shall have removed from
the Apartment any articles or materials owned by the Lessor
or its predecessor in title, or any fixtures or equipment

-33-

necessary for the use of the Apartment, the Lessee shall
either restore such articles and materials and fixtures and
equipment and repair any damage resulting from their removal
and restoration, or replace them with others of a kind and
quality customary in comparable buildings and satisfactory to
the Lessor; (iv) that, if any mortgagee had acquired a lien
on any such property prior to the execution of this lease,
Lessee shall first procure from such mortgagee its written
consent to such removal and any cost and expense incurred by
the Lessor in respect thereof shall have been paid by the
Lessee; (v) Lessee shall not remove any refrigerator, range,
air conditioner, dishwasher or washing machine unless such
are replaced with a similar appliance of equal or greater
value; and (vi) that prior to any such removal, the Lessee
shall give written notice thereof to the Lessor.

Surrender on Expiration of Term

        (c)  On the expiration or termination of this
lease, the Lessee shall surrender to the Lessor possession of
the Apartment with all additions, improvements, appliances
and fixtures then included therein, except as hereinabove
provided.  Any additions, improvements, fixtures, appliances
or other personal property not removed by the Lessee on or
before such expiration or termination of this lease shall, at
the option of the Lessor, be deemed abandoned and shall be-
come the property of the Lessor and may be disposed of by the
Lessor without liability or accountability to the Lessee.
Any other personal property not removed by the Lessee at or
prior to the termination of the lease may, at Lessor's op-
tion, be deemed abandoned or may be removed by the Lessor to
any place of storage and stored for the account of the Lessee
without the Lessor in any way being liable for trespass, con-
version or negligence by reason of any acts of the Lessor or
of the Lessor's agents or of any carrier employed in trans-
porting such property to the place of storage, or by reason
of the negligence of any person in caring for such property
while in storage.

Lease Subordinate to Mortgages and Ground Leases

        22.  This lease is and shall be subject to and sub-
ordinate to all present and future ground or underlying
leases and any mortgages now or hereafter placed upon such
leases or on the land and Building and/or any real property
owned by Lessor, and to any and all extensions, modifica-
tions, consolidations, renewals and replacements thereof and
to all security agreements and chattel mortgages on personal
property covered by any ground or underlying lease or mort-
gage.  This clause shall be self-operative and no further

-34-

instrument of subordination shall be required by any such
mortgagee or ground Lessee.  In confirmation of such sub-
ordination, the Lessee shall at any time, and from time to
time, on demand, execute any instruments that may be required
by any mortgagee, or by the Lessor, for the purpose of more
formally subjecting this lease to the lien of any such mort-
gage or mortgages or ground or underlying leases, and the
duly elected officers of the Lessor are and each of them is
hereby irrevocably appointed the attorney-in-fact and agent
of the Lessee to execute the same upon such demand, and the
Lessee hereby ratifies any such instrument hereafter executed
by virtue of the power of attorney hereby given.

In the event that a ground or underlying lease is
executed and delivered to the holder of a mortgage or mort-
gages on such ground or underlying lease or to a nominee or
designee of or a corporation formed by or for the benefit of
such holder, the Lessee hereunder will attorn to such mortga-
gee or the nominee or designee of such mortgagee or to any
corporation formed by or for the benefit of such mortgagee.

Mechanic's Lien

23.  In case a notice of mechanic's lien against
the Building shall be filed purporting to be for labor or
material furnished or delivered at the Building or the Apart-
ment to or for the Lessee, or anyone claiming under the Les-
see, the Lessee shall forthwith cause such lien to be dis-
charged by payment, bonding or otherwise; and if the Lessee
shall fail to do so within ten days after notice from the
Lessor, then the Lessor may cause such lien to be discharged
by payment, bonding or otherwise, without investigation as to
the validity thereof or of any offsets or defenses thereto,
and shall have the right to collect, as additional rent, all
amounts so paid and all costs and expenses paid or incurred
in connection therewith, including reasonable attorneys' fees
and disbursements, together with interest thereon from the
time or times of payment.

Cooperation

24.  The Lessee shall always in good faith endeavor
to observe and promote the cooperative purposes for the
accomplishment of which the Lessor is incorporated.

Right of Entry: Key

25.  The Lessor and its agents and their authorized
workmen shall be permitted to visit, examine, or enter the
Apartment and any storage space assigned to Lessee at any

-35-

reasonable hour of the day upon notice, or at any time and
without notice in case of emergency, to make or facilitate
repairs in any part of the Building or to cure any default by
the Lessee and to remove such portions of the walls, floors
and ceilings of the Apartment and storage space as may be
required for any such purpose, but the Lessor shall there-
after restore the Apartment and storage space to its proper
and usual condition at Lessor's expense if such repairs are
the obligation of Lessor or at Lessee's expense if such re-
pairs are the obligation of Lessee or are caused by the act
or omission of the Lessee or any of the Lessee's family,
guests, agents, employees or subtenants.  In order that the
Lessor shall at all times have access to the Apartment or
storage rooms for the purposes provided for in this lease,
the Lessee shall provide the Lessor with a key to each lock
providing access to the Apartment or the storage rooms and if
any lock shall be altered or a new lock installed, the Lessee
shall provide the Lessor with a key thereto immediately upon
installation.  If the Lessee shall not be personally present
to open and permit an entry at any time when an entry therein
shall be necessary or permissible hereunder and shall not
have furnished a key to Lessor, the Lessor or the Lessor's
agents (but, except in emergency, only when specifically
authorized by an officer of the Lessor or an officer of the
Managing Agent) may forcibly enter the Apartment or storage
space without liability for damages by reason thereof (if
during such entry the Lessor shall accord reasonable care to
the Lessee's property) and without in any manner affecting
the obligations and covenants of this lease.  The right and
authority hereby reserved do not impose, nor does the Lessor
assume by reason thereof, any responsibility or liability for
the care or supervision of the Apartment, or any of the
pipes, fixtures, appliances or appurtenances therein con-
tained, except as herein specifically provided.

Waivers

     26.  The failure of the Lessor to insist, in any
one or more instances, upon a strict performance of any of
the provisions of this lease, or to exercise any right or
option herein contained, or to serve any notice, or to insti-
tute any action or proceeding, shall not be construed as a
waiver, or a relinquishment for the future of any such provi-
sions, options or rights, but such provision, option or right
shall continue and remain in full force and effect.  The re-
ceipt by the Lessor of rent with knowledge of the breach of
any covenant hereof, shall not be deemed a waiver of such
breach, and no waiver by the Lessor of any provision hereof
shall be deemed to have been made unless in writing expressly
approved by the Directors.

-36-

Notices

27.   Any notice by or demand from either party to
the other shall be duly given only if in writing and sent by
certified or registered mail, return receipt requested; if by
the Lessee, addressed to the Lessor at the Building with a
copy sent by regular mail to the Lessor's Managing Agent; if
by the Lessor addressed to the Lessee at the Building.   Ei-
ther party may by notice served in accordance herewith des-
ignate a different address for service of such notice or
demand.   Notices or demands shall be deemed given on the date
when mailed.

Reimbursement of Lessor's Expenses

28.   If the Lessor shall incur any expenses (wheth-
er paid or not) in performing acts which the Lessee is re-
quired to perform, or in instituting any action or proceeding
based on any default by Lessee, or in defending, or in as-
serting a counterclaim in any action or proceeding brought by
the Lessee, the expense thereof to the Lessor, including rea-
sonable attorneys' fees and disbursements, shall be paid by
the Lessee to the Lessor, on demand, as additional rent.

Lessor's Immunities

29.   (a)   The Lessor shall not be liable, except by
reason of Lessor's wilful acts or gross negligence, for any
failure or insufficiency of heat, or of air-conditioning
(where air-conditioning is supplied or air-conditioning
equipment is maintained by the Lessor), water supply, elec-
tric current, gas, telephone, or elevator service or other
service to be supplied by the Lessor hereunder or for in-
terference with light, air, view or other interests of the
Lessee.   No abatement of rent or other compensation or claim
of eviction shall be made or allowed because of the making or
failure to make or delay in making any repairs, alterations
or decorations to the Building or any fixtures or appurte-
nances therein, or for space taken to comply with any law,
ordinance or governmental regulation, or for interruption or
curtailment of any service agreed to be furnished by the Les-
sor due to accidents, alterations or repairs, or to diffi-
culty or delay in securing supplies or labor or other cause,
unless due to Lessor's wilful acts or gross negligence.

Storage Space and Laundry

(b)   If the Lessor shall furnish to the Lessee
any storage bins or space, the use of the laundry, or any
facility outside the Apartment, including but not limited to

-37-

a television antenna, the same shall be deemed to have been
furnished gratuitously by the Lessor under a revocable li-
cense.  The Lessee shall not use such storage space for the
storage of valuable or perishable property and any such stor-
age space assigned to Lessee shall be kept by Lessee clean
and free of combustibles.  If washing machines or other
equipment are made available to the Lessee, the Lessee shall
use the same on the understanding that such machines or
equipment may or may not be in good order and repair and that
the Lessor is not responsible for such equipment, nor for any
damage caused to the property of the Lessee resulting from
the Lessee's use thereof, and that any use that Lessee may
make of such equipment shall be at his or her own cost, risk
and expense.

Automobiles and Other Property

          (c)  The Lessor shall not be responsible for
any damage to any automobile or other vehicle left in the
care of any employee of the Lessor by the Lessee, and the
Lessee hereby agrees to hold the Lessor harmless from any
liability arising from any injury to person or property
caused by or with such automobile or other vehicle while in
the care of such employee.  The Lessor shall not be respon-
sible for any property left with or entrusted to any employee
of the Lessor, or for the loss of or damage to any property
within or without the Apartment by theft or otherwise.

Window Cleaning

          30.  The Lessee will not require, permit, suffer or
allow the cleaning of any window in the premises from the
outside (within the meaning of Section 202 of the New York
Labor Law) unless the equipment and safety devices required
by law, ordinance, rules and regulations, including, without
limitation, Section 202 of the New York Labor Law, are pro-
vided and used, and unless the Industrial Code of the State
of New York is fully complied with; and the Lessee hereby
agrees to indemnify the Lessor and its employees as a result
of the Lessee's requiring, permitting, suffering or allowing
any window in the premises to be cleaned from the outside in
violation of the requirements of the aforesaid laws, ordi-
nances, regulations and rules.

Termination by Lessor

          31.  If upon, or at any time after, the happening
of any of the events mentioned in subsections (a) to (j) in-
clusive of this Paragraph 31, the Lessor shall give to the
Lessee a notice stating that the term hereof will expire on a

-38-

date at least five days thereafter, the term of this lease
shall expire on the date so fixed in such notice as fully and
completely as if it were the date herein definitely fixed for
the expiration of the term, and all right, title and interest
of the Lessee hereunder shall thereupon wholly cease and ex-
pire, and the Lessee shall thereupon quit and surrender the
Apartment to the Lessor, it being the intention of the par-
ties hereto to create hereby a conditional limitation, and
thereupon the Lessor shall have the right to re-enter the
Apartment and to remove all persons and personal property
therefrom, either by summary dispossess proceedings, or by
any suitable action or proceeding at law or in equity, or by
force or otherwise, and to repossess the Apartment in its
former estate as if this lease had not been made, and no lia-
bility whatsoever shall attach to the Lessor by reason of the
exercise of the right of re-entry, re-possession and removal
herein granted and reserved:

Lessee Ceasing to Own Accompanying Shares

          (a)  If the Lessee shall cease to be the owner
of the shares to which this lease is appurtenant, or if this
lease shall pass or be assigned to anyone who is not then the
owner of all said shares;

Lessee Becoming a Bankrupt or Default under Security Agree-
ment

          (b)  if at any time during the term of this
lease (i) the Lessee shall commence an action or proceeding
or have entered against him an order for relief under any
chapter of the Federal Bankruptcy Code (Title II of the
United States Code); or (ii) a receiver of all of the prop-
erty of the Lessee or of this lease shall be appointed under
any provision of the laws of the State of New York, or under
any statute of the United States, or any statute of any state
of the United States and the order appointing such receiver
shall not be vacated within thirty (30) days; or (iii) the
Lessee shall make a general assignment for the benefit of
creditors; or (iv) any of the shares owned by the Lessee to
which this lease is appurtenant shall be duly levied upon
under the process of any court whatever unless such levy
shall be discharged within thirty (30) days; or (v) this
lease or any of the shares to which it is appurtenant shall
pass by operation of law or otherwise to anyone other than
the Lessee herein named or a person to whom such Lessee has
assigned this lease in the manner herein permitted, but this
subsection (v) shall not be applicable if this lease shall
devolve upon the executors or administrators of the Lessee
and provided that within eight (8) months (which period may

-39-

be extended by the Directors which consent may not be unrea-
sonably withheld) after the death of Lessee this lease and
shares shall have been transferred to any assignee in accor-
dance with Paragraph 16 hereof; or (vi) this lease or any of
the shares to which it is appurtenant shall pass to anyone
other than the Lessee herein named by reason of a default by
the Lessee under a pledge, security agreement or a leasehold
mortgage made by the Lessee other than in accordance with the
provisions of Paragraph 17 or with a lender who was a holder
of Unsold Shares at the time of the transfer;

Assignment, Subletting or Unauthorized Occupancy

          (c)  If there be an assignment of this lease,
or any subletting hereunder, without full compliance with the
requirements of Paragraphs 15 or 16 hereof; or if any person
not authorized by Paragraph 14 shall be permitted to use or
occupy the Apartment and the Lessee shall fail to cause such
unauthorized person to vacate the Apartment within ten (10)
days after written notice from the Lessor;

Default in Rent

          (d)  If the Lessee shall be in default for a
period of one month in the payment of any rent or additional
rent or of any installment thereof and shall fail to cure
such default within ten days after written notice from the
Lessor;

Default in Other Covenants

          (e)  If the Lessee shall be in default in the
performance of any covenant or provision hereof, other than
the covenant to pay rent or a covenant or obligation for
which a different time period is herein provided, and such
default shall continue for thirty (30) days after written
notice from the Lessor or shall continue after another speci-
fic time period for default herein; provided, however, that
if said default consists of the failure to perform any act
the performance of which in the reasonable opinion of Lessor
requires more than thirty (30) days to cure, then if within
said period of thirty (30) days such performance is commenced
and thereafter diligently prosecuted to conclusion without
delay and interruption, the Lessee shall be deemed to have
cured said default;

Lessee's Objectionable Conduct

          (f)  If at any time the Lessor shall deter-
mine, upon the affirmative vote of two-thirds of its then

-40-

Board of Directors, at a meeting duly called for that pur-
pose, that because of objectionable conduct on the part of
the Lessee, or of a person dwelling or visiting in the Apart-
ment, repeated after written notice from Lessor, the tenancy
of the Lessee is undesirable (it being understood, without
limiting the generality of the foregoing, that repeatedly to
violate or disregard this lease or the House Rules hereto
attached or thereafter established in accordance with the
provisions of this lease, or to permit or tolerate a person
of dissolute, loose or immoral character to enter or remain
in the Building or the Apartment, shall be deemed to be ob-
jectionable conduct);

Termination of All Proprietary Leases

     (g)   If at any time the Lessor shall deter-
mine, upon the affirmative vote of two-thirds of its then
Board of Directors at a meeting of such Directors duly called
for that purpose, and the affirmative vote of the record
holders of at least 80% in amount of its then issued shares,
at a shareholders' meeting duly called for that purpose, to
terminate all proprietary leases;

Destruction of Building

     (h)   If the Building shall be destroyed or
damaged and the shareholders shall decide not to repair or
rebuild as provided in Paragraph 4;

Condemnation

     (i)   If at any time the Building or a sub-
stantial portion thereof shall be taken by condemnation pro-
ceedings;

Lessee's Default Under Security Agreement

     (j)   If Lessee shall default in the payment or
performance of any of Lessee's obligations under any pledge
or other security agreement given a Secured Party and notice
of such default is given to Lessor by the Secured Party or
its counsel.

Lessor's Rights after Lessee's Default

     32.   (a)   In the event the Lessor resumes posses-
sion of the Apartment, either by summary proceedings, action
of ejectment or otherwise, because of default by the Lessee
in the payment of any rent or additional rent due hereunder,
or on the expiration of the term pursuant to a notice given

-41-

as provided in Paragraph 31 hereof upon the happening of any
event specified in subsections (a) to (f) inclusive or (j) of
Paragraph 31, Lessee shall continue to remain liable for pay-
ment of a sum equal to the rent which would have become due
hereunder and shall pay the same in installments at the time
such rent would be due hereunder.  No suit brought to recover
any installment of such rent or additional rent shall preju-
dice the right of the Lessor to recover any subsequent in-
stallment.  After resuming possession, the Lessor may, at its
option, from time to time (i) relet the Apartment for its own
account, or (ii) relet the Apartment as the agent of the Les-
see, in the name of the Lessee or in its own name, for a term
or terms which may be less than or greater than the period
which would otherwise have constituted the balance of the
term of this lease, and may grant concessions or free rent,
in its discretion.  Any reletting of the Apartment shall be
deemed for the account of the Lessee, unless within ten (10)
days after such reletting the Lessor shall notify the Lessee
that the premises have been relet for the Lessor's own ac-
count.  The fact that the Lessor may have relet the Apartment
as agent for the Lessee shall not prevent the Lessor from
thereafter notifying the Lessee that it proposes to relet the
Apartment for its own account.  If the Lessor relets the
Apartment as agent for the Lessee it shall, after reimbursing
itself for its expenses in connection therewith, including
leasing commissions and a reasonable amount for attorneys'
fees and expenses, and decorations, alterations and repairs
in and to the Apartment, apply the remaining avails of such
reletting against the Lessee's continuing obligations here-
under.  There shall be a final accounting between the Lessor
and the Lessee upon the earlier of the four following dates:
(A) the date of expiration of the term of this lease as stat-
ed on page 1 hereof; (B) the date as of which a new proprie-
tary lease covering the Apartment shall have become effec-
tive; (C) the date the Lessor gives written notice to the
Lessee that it has relet the Apartment for its own account;
(D) the date upon which all proprietary leases of the Lessor
terminate.  From and after the date upon which the Lessor be-
comes obligated to account to the Lessee, as above provided,
the Lessor shall have no further duty to account to the Les-
see for any avails of reletting and the Lessee shall have no
further liability for sums thereafter accruing hereunder; but
such termination of the Lessee's liability shall not affect
any liabilities theretofore accrued.

Collection of Rent from Subtenants

        (b)  If the Lessee shall at any time sublet
the Apartment and shall default in the payment of any rent or
additional rent, the Lessor may, at its option, so long as

-42-

such default shall continue, demand and receive from the sub-
tenant the rent due or becoming due from such subtenant to
the Lessee, and apply the amount to pay sums due and to be-
come due from the Lessee to the Lessor.  Any payment by a
subtenant to the Lessor shall constitute a discharge of the
obligation of such subtenant to the Lessee, to the extent of
the amount so paid.  The acceptance of rent from any sub-
tenant shall not be deemed a consent to or approval of any
subletting or assignment by the Lessee, or a release or dis-
charge of any of the obligations of the Lessee hereunder.

Sale of Shares

              (c)  Upon the termination of this lease under
the provisions of subsections (a) to (f) inclusive or (j) of
Paragraph 31, the Lessee shall surrender to the Lessor the
certificate for the shares of the Lessor owned by the Lessee
to which this lease is appurtenant.  Whether or not said cer-
tificate is surrendered, the Lessor may issue a new proprie-
tary lease for the Apartment and issue a new certificate for
the shares of the Lessor owned by the Lessee and allocated to
the Apartment when a purchaser therefor is obtained, provided
that the issuance of such shares and such lease to such pur-
chaser is authorized by a resolution of the Directors, or by
a writing signed by a majority of the Directors or by the
Lessees owning, of record, at least a majority of the shares
of the Lessor accompanying proprietary leases then in force.
Upon such issuance the certificate owned or held by the Les-
see shall be automatically cancelled and rendered null and
void.  The Lessor shall apply the proceeds received for the
issuance of such shares first, towards the payment of the
Lessee's indebtedness hereunder (including interest, attor-
neys' fees and other expenses incurred by the Lessor); sec-
ond, if said termination shall result pursuant to subdivision
(j) of Paragraph 31 by reason of a default under the Security
Agreement, towards the payment of Lessee's indebtedness under
the Security Agreement (including all costs, expenses and
charges payable by Lessee thereunder); and, third if the pro-
ceeds are sufficient to pay the foregoing, the Lessor shall
pay over any surplus to the Lessee, but, if insufficient, the
Lessee shall remain liable for the balance of the indebted-
ness due hereunder (and if applicable) under said Security
Agreement.  Upon the issuance of any such new proprietary
lease and certificate, the Lessee's liability hereunder shall
cease and the Lessee shall only be liable for rent and ex-
penses accrued to that time.  The Lessor shall not, however,
be obligated to sell such shares and appurtenant lease or
otherwise make any attempt to mitigate damages.

-43-

## Waiver of Right of Redemption

33.   The Lessee hereby expressly waives any and all
right of redemption in case the Lessee shall be dispossessed
by judgment or warrant of any court or judge.  The words
"enter", "re-enter" and "re-entry" as used in this lease are
not restricted to their technical legal meaning.

## Surrender of Possession

34.   Upon the termination of this lease under the
provisions of subsections (a) to (f) inclusive or (j) of
Paragraph 31, Lessee shall remain liable as provided in Para-
graph 32 of this lease.  Upon the termination of this lease
under any other of its provisions, the Lessee shall be and
remain liable to pay all rent, additional rent and other
charges due or accrued and to perform all covenants and
agreements of the Lessee up to the date of such termination.
On or before any such termination the Lessee shall vacate the
Apartment and surrender possession thereof to the Lessor or
its assigns, and upon demand of the Lessor or its assigns,
shall execute, acknowledge and deliver to the Lessor or its
assigns any instrument which may reasonably be required to
evidence the surrendering of all estate and interest of the
Lessee in the Apartment or in the Building.

## Lessee's Option to Cancel

35.   (a)  This lease may be cancelled by the Lessee
on any September 30th after the third anniversary of the con-
summation of the Plan upon compliance with all the provisions
hereinafter set forth.  Irrevocable written notice of inten-
tion to cancel must be given by the Lessee to the Lessor on
or before April 1 in the calendar year in which such cancel-
lation is to occur.  At the time of the giving of such notice
of intention to cancel there must be deposited with the
Lessor by the Lessee:

## Deposits Required

(i)  the Lessee's counterpart of this lease
with a written assignment in form required by the Lessor, in
blank, effective as of August 31 of the year of cancellation,
free from all subleases, tenancies, liens, encumbrances,
pledged, security interests and other charges whatsoever
(except rights of occupancy of third parties existing on the
date that the Plan consummated);

(ii)  the Lessee's certificate for his or her
shares of the Lessor, endorsed in blank for transfer and with

-44-

all necessary transfer tax stamps affixed and with payment of
any transfer taxes due thereon:

      (iii)  a written statement setting forth in
detail those additions, improvements, fixtures or equipment
which the Lessee has under the terms of this lease, the right
to and intends to remove.

Removal of Fixtures; Possessions

      (b)  All additions, improvements, appliances
and fixtures which are removable under the terms of this
lease and which are enumerated in the statement made as pro-
vided in subdivision (iii) above shall be removed by the Les-
see prior to August 31st of the year of cancellation, and on
or before said August 31st the Lessee shall deliver posses-
sion of the Apartment to the Lessor in good condition with
all required equipment, fixtures and appliances installed and
in proper operating condition and free from all subleases and
tenancies, liens, encumbrances and other charges (except
rights of occupancy of third parties existing on the date
that the Plan was consummated) and pay to the Lessor all
rent, additional rent and other charges which shall be pay-
able under this lease up to and including the following
September 30th.

Permission to Show and Occupy Premises

      (c)  The Lessor and its agents may show the
Apartment to prospective Lessees, contractors and architects
at reasonable times after notice of the Lessee's intention to
cancel.  After August 31st or the earlier vacating of the
Apartment, the Lessor and its agents, employees and Lessees
may enter the Apartment, occupy the same and make such alter-
ations and additions therein as the Lessor may deem necessary
or desirable without diminution or abatement of the rent due
hereunder.

Effective Date of Cancellation

      (d)  If the Lessee is not otherwise in default
hereunder and if the Lessee shall have timely complied with
all of the provisions of subdivisions (a) and (b) hereof,
then this lease shall be cancelled and all rights, duties,
and obligations of the parties hereunder shall cease as of
the September 30th fixed in said notice, and the shares of
Lessee shall become the absolute property of the Lessor, pro-
vided, however, that the Lessee shall not be released from
any indebtedness owing to the Lessor on said last mentioned
date.

-45-

Rights on Lessee's Default

(e)  If the Lessee shall give the notice but
fail to comply with any of the other provisions of this Para-
graph 35, the Lessor shall have the option at any time prior
to September 30th (i) of returning to the Lessee this lease,
the certificate for the shares and other documents deposited,
and thereupon the Lessee shall be deemed to have withdrawn
the notice of intention to cancel this lease, or (ii) of
treating this lease as cancelled as of the September 30th
named in the notice of intention to cancel as the date for
the cancellation of such lease, and bringing such proceedings
and actions as it may deem best to enforce the covenants of
the Lessee hereinabove contained and to collect from the Les-
see the payments which the Lessee is required to make here-
under, together with reasonable attorneys' fees and expenses.

Extension of Option to Cancel

36.  (a)  If on April 1st in any year the total
number of shares owned by Lessees holding Proprietary Leases,
who have given notice pursuant to Paragraph 35 of intention
to cancel such Proprietary Leases on September 30th of said
year, shall aggregate ten percent (10%) or more of the Les-
sor's outstanding shares, exclusive of treasury shares, then
the Lessor shall, prior to April 30th in such year, give a
written notice to the holders of all issued shares of the
Lessor stating the 'total number of shares then outstanding
and in its treasury and the total number of shares owned by
Lessees holding Proprietary Leases who have given notice of
intention to cancel.  In such case the Proprietary Lessees to
whom such notice shall have been given shall have the right
to cancel their leases in compliance with the provisions of
Paragraph 35 hereof, provided only that written notice of the
intention to cancel such leases shall be given on or before
July 1st instead of April 1st.

Right of Lessees to Cancel

(b)  If Lessees owning at least 80% of the
then issued and outstanding shares of the Lessor shall exer-
cise the option to cancel their leases in one year, then this
and all other Proprietary Leases shall thereupon terminate on
the September 30th of the year in which such options shall
have been exercised, as though every Lessee had exercised
such option.  In such event none of the Lessees shall be re-
quired to surrender his or her shares to the Lessor and all
certificates for shares delivered to the Lessor by those who
had, during that year, served notice of intention to cancel

-46-

their leases under the provisions hereof, shall be returned
to such Lessees.

Continuance of Cooperative Management of
Building After All Leases Terminated

37.   No later than thirty days after the termina-
tion of all proprietary leases, whether by expiration of
their terms or otherwise, a special meeting of shareholders
of the Lessor shall take place to determine whether (a) to
continue to operate the Building as a residential Apartment
Building, (b) to alter, demolish or rebuild the Building or
any part thereof, or (c) to sell the Building and liquidate
the assets of the Lessor, and the Directors shall carry out
the determination made at said meeting of shareholders of the
Lessor, and all of the holders of the then issued and out-
standing shares of the Lessor shall have such rights as enure
to shareholders of corporations having titles to real estate.

Rights of Holders of Unsold Shares and/or Sponsor

38.   A.   (a)   The term "Unsold Shares" means and
has exclusive reference to the shares of the Lessor which
were issued on the date of consummation of the Plan to the
Sponsor of the Plan or any principal of the Sponsor or any
entity in which the Sponsor or principals of the Sponsor are
principals or to persons specifically designated by the Spon-
sor to be holders of Unsold Shares (i.e. notwithstanding the
foregoing, Unsold Shares are those shares of Lessor which
have never been sold by the Sponsor or holders of Unsold
Shares to purchasers under the Offering Plan for the property
owned by Lessor or for which the total cash payment has not
been received in full under the first subscription or
purchase agreement for the sale of such shares).   Designees
of such acquirers of Unsold Shares to whom Unsold Shares are
transferred subsequent to the date of consummation of the
Plan who are specifically designated by such transferor as a
holder of Unsold Shares are also referred to as "holders of
Unsold Shares."

All shares which are Unsold Shares (including
shares which may be owned by Lessees who are also purchasers
for investment or resale as defined in the Plan) retain their
character as such (regardless of transfer) until the holder
or a person related by blood or marriage to the holder be-
comes a bona fide resident of the Apartment, or a purchaser
from the holder purchases for his or her bona fide occupancy
of the apartment or the occupancy of a specified member of
his or her immediate family.

-47-

Subletting Apartment and Assignment of Lease

(b)   Neither the subletting of the Apartment
nor the assignment of this lease, by the Lessee who is a
holder of the block of Unsold Shares allocated thereto, shall
require the consent of the Directors or shareholders, as pro-
vided in Paragraphs 15 and 16.

Loans by Purchasers

(c)   Anything contained in this lease to the
contrary notwithstanding, the Lessor may not impose any limit
on a loan which may be obtained by a holder of Unsold Shares
or a purchaser from a holder of Unsold Shares.  If a holder
of Unsold Shares regains such shares due to foreclosure or
some other loan provision in connection with a holder of Un-
sold Share's financing arrangement with a purchaser from such
holder, then such shares shall regain their character as Un-
sold Shares.  Upon request, Lessor will promptly execute and
deliver to a bank or other lender (i) the Aztech form of
Recognition Agreement, or (ii) the form of Recognition Agree-
ment set forth in the Offering Plan, as amended, or (iii) in
the discretion of the Lessor, any form substantially similar
to the Aztech form of Recognition Agreement then being used
by banks in New York City and on such other terms which the
lender and the Lessor, in their discretion, may agree to for
the protection of their respective interests.

Fees

(d)   No sum for legal or other expenses re-
ferred to in Paragraph 16(a)(iv) of this lease shall be due
from a Lessee who is a holder of Unsold Shares, in connection
with an assignment and transfer of such shares (and of this
lease) or sublet of the Apartment so long as the shares re-
tain their character as Unsold Shares.  The fees described in
Paragraph 16(h) or elsewhere shall not be payable by a holder
of Unsold Shares.  In the event that this exemption for the
benefit of holders of Unsold Shares is determined by a final
judgment of a court of competent jurisdiction, to be in some
manner discriminatory against other Lessees, or to in any way
create an unenforceable distinction among Lessees, then in
such event, no fee of the type described herein may be col-
lected from Lessee or any other Lessees.

(e)   The provisions of Paragraph 35 are not
applicable to a Lessee who is the holder of the Unsold Shares
accompanying this lease.  A holder of Unsold Shares will not
have the right to cancel his or her lease and surrender his
or her shares, which other shareholders will have, until at

-48-

least five years after the date of consummation of the Plan,
unless: (i) shareholders, other than holders of Unsold
Shares, owning a majority of the outstanding shares of the
Lessor have given notice of intent to cancel their respective
leases; (ii) all Unsold Shares constitute fifteen (15%) per-
cent or less of the outstanding shares of the Lessor; and
(iii) the holder of Unsold Shares pays to the Lessor a sum
determined by multiplying the monthly maintenance charges in
effect when the lease is cancelled by 24 and delivers to Les-
sor the Lessee's counterpart of this lease with a written
assignment in form required by the Lessor, in blank, free
from all liens, encumbrances and other charges whatsoever,
other than a tenancy which was in existence when this lease
was executed, and the Lessee's certificate for his or her
shares of the Lessor endorsed in blank for transfer and with
all necessary transfer stamps affixed and with payment of any
transfer taxes due thereon.

    If such Lessee is not otherwise in default
hereunder and if the Lessee shall have complied with all of
the foregoing provisions, then this lease shall be cancelled
and all rights, duties and obligations of the parties here-
under shall cease as of the date of such compliance and the
shares of the Lessor shall become the absolute property of
the Lessor, provided, however, that the Lessee shall not be
released from any indebtedness owing to the Lessor on said
date.

    (f)   If a Lessee who is a holder of Unsold
Shares is required, or desires, to file an application or
other document with any agency administering any type of rent
control (including the present Rent and Rehabilitation Law
("RRL"), or the Rent Stabilization Law ("RSL"), or any
amendments to such laws or similar legislation), the Lessor
shall cooperate, in all respects, including the furnishing of
information and access to and/or copies of all books, records
and documents reasonably required in connection therewith,
and the filing by, and in the name of, the Lessor of docu-
ments required to be filed by it in connection therewith.
The holder of Unsold Shares will pay to the Lessor any ex-
penses that Lessor incurs in complying with the foregoing.

    (g)   If shares allocated to an apartment which
is the subject of a rent exemption order issued pursuant to
Section YY 51-4.1 or section Y51-5.0 of the NYC Administra-
tive Code or any similar provision of law are owned by a hol-
der of Unsold Shares, the Lessor shall file all documents
necessary to obtain a tax abatement pursuant to Section YY
51-4.1(2)(b)(iv) or Section 51-5.1 of the NYC Administrative
Code or any similar provision of law, and the maintenance

-49-

payable by the owner of such shares will be reduced to the
extent of any tax abatement received.

(h)  The Lessor will cooperate with Lessees
who are holders of Unsold Shares in connection with the sale
of their shares or the subleasing of the Apartments to which
the shares are allocated and in connection with the filing of
requisite amendments to the Plan.  Such cooperation shall
include the furnishing of all relevant information concerning
the Building and its operation and the furnishing of all re-
quired documents.  If such documents are not in existence,
the holders of Unsold Shares requesting them shall pay the
cost of their preparation.

(i)  The Lessor shall be required to furnish
to tenants or subtenants of Apartments for which the Proprie-
tary Lessees are holders of Unsold Shares, all services to
which such tenants or subtenants are entitled under the RRL,
the RSL, or amendments thereto, or other laws, except ser-
vices which the holder of Unsold Shares is required to fur-
nish by his or her proprietary lease.

(j)  Until all Unsold Shares have been sold to
purchasers for occupancy, the Lessor shall not eliminate or
diminish any existing services unless the holders of Unsold
Shares consent thereto.

(k)  If Lessee is a holder of Unsold Shares,
Lessee may change the number of Apartments by increasing or
decreasing their sizes, or change the sizes, layouts or loca-
tions of any such Apartment or subdivide same, and such Les-
see shall have the right to reallocate the shares allocated
to any of the Apartments, except in the case of the issuance
of new shares by Lessor or the allocation of shares of Lessor
to space to which shares had not previously been allocated,
in which event such reallocation must, in the opinion of a
real estate expert selected by Lessee (which such opinion
shall be conclusive and binding on Lessor), to reflect a
change in the value of the equity in the Property attribut-
able to the Apartment or Apartments to which the block of
shares is being reallocated.  Any such changes permitted by
this Paragraph 38(k) must comply with law and may not perma-
nently encroach on any pre-existing public or common area in
the Building.

Upon any regrouping of space in the Building, the
Proprietary Leases so affected and the accompanying share
certificates shall be surrendered, and there shall be execut-
ed and delivered in place thereof, respectively, a new Pro-
prietary Lease for each separate apartment involved, and a

-50-

new certificate for the number of shares so reallocated to
each new Proprietary Lease.

(l)   Notwithstanding the provisions of Para-
graph 21(a) of this lease, if the Lessee is a holder of Un-
sold Shares or a purchaser from such holder, the Lessee shall
have the right to make alterations or additions in or to his
or her Apartment (and to its fixtures and equipment) without
obtaining the Lessor's consent, provided such work is per-
formed in full compliance with all legal requirements and the
resulting changes do not overload existing wires or equipment
in the Building or encroach or impinge upon the public areas
of the Building.

(m)   Commencing with the annual meeting of
shareholders which will be held after the fifth anniversary
of the Closing Date, or a meeting called within thirty (30)
days after Unsold Shares constitute less than 50% of the
shares of the Lessor, whichever first occurs, holders of Un-
sold Shares will, if necessary, cast their votes so that
shareholders other than holders of Unsold Shares shall con-
stitute a majority of the Directors.

(n)   So long as holders of Unsold Shares con-
tinue to own five percent or more of the shares of the Les-
sor, but less than a sufficient number of shares to elect at
least one director, they will have the right, for five years
after the consummation of the Plan, jointly to designate one
director and the votes of the shares owned by all Lessees
shall be deemed to be cast to so allow.

(o)   Notwithstanding the provisions of Para-
graph 47, Lessor may not institute any changes pursuant to
Paragraph 47 without the consent of the holders of all Unsold
Shares, except that any such amounts may be levied without
such consent to the extent such amounts by law may be passed
through and charged to any non-purchasing tenant by a holder
of Unsold Shares who owns the shares allocated to an Apart-
ment occupied by such a non-purchasing tenant.

(p)   Notwithstanding the other provisions of
Paragraph 14 of this lease, Lessee shall have the right to
use the Apartment or require the consent of the Apartment
Corporation to use of the Apartment for business or profes-
sional practice, as set forth in Paragraph 14B.

(q)   If the Lessee is a holder of Unsold
Shares, he or she shall amend the Offering Plan to provide
current and accurate information until all of the Apartments
for which he or she owns shares have been sold to bona fide

-51-

purchasers and to provide prospective purchasers of the
apartments with copies of the Plan and all filed amendments.

(r) If any provision of the Plan grants any
additional rights or privileges to holders of Unsold Shares,
those provisions shall be deemed to be incorporated in this
lease and holders of Unsold Shares shall be entitled to those
respective rights and privileges as if those provisions were
expressly set forth in this lease.

(s) If there are any inconsistencies between
this lease and the Plan with respect to the rights, privi-
leges or obligations of holders of Unsold Shares, the provi-
sions of the Plan shall control.

(t) Anything contained in this lease to the
contrary notwithstanding, without the consent of a Lessee who
is a holder of Unsold Shares, no change in the form, terms or
conditions of the lease shall (1) affect his or her rights to
sublet the Apartment or to assign this lease; or (2) elimi-
nate or modify any other of his or her rights or privileges.

(u) Notwithstanding the provisions of Para-
graph 47 of this lease, in the event that (i) the Lessee is
the Sponsor or other holder of Unsold Shares, and (ii) the
Apartment is occupied by a non-purchasing tenant in occupancy
on the date that the Cooperative Offering Plan for the Prop-
erty was accepted for filing, and (iii) submetering or other
metering pursuant to Paragraph 47 is instituted; then Lessor
shall indemnify and hold Lessee harmless against any amount
of utilities charges payable by Lessee either to the utility
company or under this lease which are in excess of the util-
ity charges that would have been payable otherwise by Lessor
if the metering system under Paragraph 47 had not been
adopted, and such indemnity shall include, but shall not be
limited to, any cost or expense, including, but not limited
to, reasonable attorneys' fees, in connection with any appli-
cation to the New York State Division of Housing and Commu-
nity Renewal for authorization to pass any such utility
charges along to such a non-purchasing tenant.

(v) Lessee understands and agrees that the
Sponsor of the Cooperative Offering Plan for conversion of
the Property to cooperative ownership retained certain "De-
velopment Rights" as described in Section W of said Plan and
Lessee and Lessor agreed to allow Sponsor or such other
holder of such Development Rights to exercise its rights as
described in that Section.

-52-

(w)   Lessor hereby irrevocably makes, consti-
tutes and appoints Raynes Associates Limited Partnership,
with full power of substitution, as the true and lawful
attorney-in-fact of Lessor, coupled with an interest, with
full power, from time to time, in the name, place and stead
of Lessor to (i) execute and record or file on behalf of Les-
sor any document required to be executed by Lessor contem-
plated by this Paragraph 38; (ii) sign, execute, acknowledge,
swear to, verify, deliver, file, record and publish or per-
form any one or more of the foregoing acts in the event that
Lessor fails to adequately or timely perform any one or more
of its obligations pursuant to this Paragraph 38; and
(iii) take any other action contemplated by this Paragraph
38.  This power of attorney is hereby declared to be irre-
vocable, with full power of substitution, and coupled with an
interest.  This power of attorney shall survive bankruptcy of
Lessor and shall extend to and be binding upon the successors
and assigns of Lessor.  This power of attorney may be exer-
cised by any substitute designated by Raynes Associates Lim-
ited Partnership.  A facsimile signature shall be effective
if so affixed.

(x)   Lessor expressly acknowledges and agrees
that in the event that Lessor fails to timely perform its
obligations to a Holder of Unsold Shares as set forth in this
Paragraph 38, Lessor shall be obligated to pay damages in an
amount equal to the sum of (i) any and all consequential dam-
ages, including, but not limited to, a reimbursement of lost
profits, costs and expenses, reasonable attorneys' fees and
out-of-pocket expenses, plus interest at the then published
prime rate of interest then charged by Manufacturers Hanover
Trust Company or other commercial lenders doing business in
New York City plus 3% to accrue from the later of the date of
request or the date that such obligation was first incurred
and (ii) an additional penalty in the amount of $2,500 for
each of such events.

(y)   As long as Executive Life Insurance Com-
pany ("Executive") or any entity in which Executive owns an
interest, is a Holder of Unsold Shares:

(i)   upon request of Executive or its
related entity, the Lessor shall deliver to the requesting
party, not later than the 30th day of each month (a) a
monthly summary cash flow statement for the preceding
calendar month, and for the year to date, showing beginning
and ending cash balances, (b) a statement of the monthly rent
roll, a monthly arrears statement of rent and maintenance,
with aging balances, if any, and (c) any other reports
reasonably required by the requesting party, which other

reports shall be at the requesting party's expense, if the same are prepared by an accounting firm.  In addition, the Lessor shall, upon the request of Executive or its related entity, cooperate with it and any accountants retained by it in connection with the preparation of (1) quarter-annual accrual reports for the preceding calendar quarters, which reports shall contain income, receivables, expenses (including accrued or prepaid taxes), service expense recoveries due from tenants, and an estimate of income and expense for the current calendar quarter and (2) a statement of income and expenses on an accrual basis for the preceding calendar year, which shall contain actual budget and variance analysis information; and

(ii)  the Lessor shall, upon the request of Executive or its related entity, make all books and records of the Apartment Corporation available for audit, inspection and/or copying by a representative of the New York Insurance Department and deliver such books and records to such representative.

[There is no subparagraph (z)]

(aa)  In the event Raynes Associates Limited Partnership (Sponsor of the Plan) or its designee reacquires this lease and the appurtenant shares through an "Alternative Purchase Plan" as described in the Plan (as amended), or through foreclosure of a lien or shares of stock, or through any other means, such shares shall immediately regain all the characteristics of Unsold Shares set forth in this lease, including, but not limited to, exemption from any transfer fees and exemption from restrictions on resale, subletting and alterations.

B.  Lessee understands and agrees that Lessee and the Proprietary Lessees of all other apartments in the Building (and the successors and assigns of all Lessees, including Lessee) agree that the shares of Lessor owned by them and their votes as Proprietary Lessees shall be voted at all meetings of Lessor's shareholders or Lessees, as the case may be, consistently with and in such a manner as to accomplish and enforce the rights of holders of Unsold Shares set forth in the form of Proprietary Lease (including, but not limited to, the rights set forth in Paragraph 38).  The agreement referred to in the immediately preceding sentence may be enforced in any lawful manner and Lessee hereby irrevocably appoints the Sponsor of the Plan or any officer of the Sponsor or any person designated by the Sponsor as his or her attorney-in-fact coupled with an interest with authority and power to cast Lessee's shares or Lessee's interest as Lessee in any vote in such a manner as is required in accordance with the agreement set forth in this Paragraph 38B.

-54-

Foreclosure - Receiver of Rents

39.    Notwithstanding anything contained in this
lease, if any action shall be instituted to foreclose any
mortgage on the land or the Building or a leasehold of the
land or the Building, the Lessee shall, on demand, pay to the
receiver of the rents appointed in such action rent, if any,
owing hereunder on the date of such appointment and shall pay
thereafter to such receiver in advance, on the first day of
each month during the pendency of such action, as rent here-
under, the rent for the Apartment as last determined and es-
tablished by the Directors prior to the commencement of said
action, and such rent shall be paid during the period of such
receivership, whether or not the Directors shall have deter-
mined and established the rent payable hereunder for any part
of the period during which such receivership may continue.
The provisions of this Paragraph are intended for the benefit
of present and future mortgagees of the land or the Building
or a leasehold of the land or the Building and may not be
modified or annulled without the prior written consent of any
such mortgage holder.

To Whom Covenants Apply

40.    The references herein to the Lessor shall
be deemed to include its successors and assigns, and the ref-
erences herein to the Lessee (sometimes referred to a share-
holder of the Lessor) shall be deemed to include the execu-
tors, administrators, legal representatives, legatees, dis-
tributees and assigns of the Lessee; and the covenants herein
contained shall apply to, bind and inure to the benefit of
the Lessor and its successors and assigns, and the Lessee and
the executors and administrators, legal representatives, leg-
atees, distributees and assigns of the Lessee, except as
hereinabove stated.

Waiver of Trial by Jury

41.    To the extent permitted by law, the respective
parties hereto shall and they hereby do waive trial by jury
in any action, proceeding or counterclaim brought by either
of the parties hereto against the other on any matters what-
soever arising out of or in any way connected with this
lease, the Lessee's use or occupancy of the Apartment, or any
claim of damages resulting from any act or omission of the
parties in any way connected with this lease or the Apart-
ment.

-55-

Lessor's Additional Remedies

42.   In the event of a breach or threatened breach
by Lessee of any provision hereof, the Lessor shall have the
right of injunction and the right to invoke any remedy at law
or in equity, as if re-entry, summary proceedings and other
remedies were not herein provided for, and the election of
one or more remedies shall not preclude the Lessor from any
other remedy.

Lessee More Than One Person

43.   If more than one person is named as Lessee
hereunder, the Lessor may require the signatures of all such
persons in connection with any notice to be given or action
to be taken by the Lessee hereunder, including, without lim-
iting the generality of the foregoing, the surrender or as-
signment of this lease, or any request for consent to assign-
ment or subletting.   Each person named as Lessee shall be
jointly and severally liable for all of the Lessee's obli-
gations hereunder.   Any notice by the Lessor to any person
named as Lessee shall be sufficient, and shall have the same
force and effect, as though given to all persons named as
Lessee.

Effect of Partial Invalidity

44.   If any clause or provision herein contained
shall be adjudged invalid, the same shall not affect the
validity of any other clause or provision of this lease, or
constitute any cause of action in favor of either party as
against the other.

Notice to Lessor of Default

45.   The Lessee may not institute an action or pro-
ceeding against the Lessor or defend, or assert a counter-
claim in any action by the Lessor related to the Lessee's
failure to pay rent, if such action, defense or counterclaim
is based upon the Lessor's failure to comply with its obliga-
tions under this lease or any law, ordinance or governmental
regulation unless such failure shall have continued for at
least thirty (30) days before such action or proceeding was
commenced and the giving of written notice thereof by the
Lessee to the Lessor.

Unity of Shares and Lease

46.   The shares of the Lessor held by the Lessee
and allocated to the Apartment have been acquired and are

-56-

owned subject to the following conditions agreed upon with
the Lessor and with each of the other proprietary lessees for
their mutual benefit:

 (a) the shares represented by each certifi-
cate are transferable only as an entirety and only in con-
nection with a simultaneous transfer of this lease, unless
transferred pursuant to Article V Section 6 of the By-Laws of
the Lessor in connection with the regrouping of space in one
or more apartments.

 (b) the shares shall not be sold or trans-
ferred except to the Lessor or to an assignee of this lease
after compliance with all of the provisions of this lease
relating to assignments.

Charges for Gas and Electricity

 47. Except as provided in Paragraph 38 hereof:

 (a) Notwithstanding that at any time or times
during the term of this lease the consumption of gas or elec-
tricity, or both, in the Apartment is measured by a meter
which also measures consumption outside the Apartment, the
Lessor may not require charges to be paid by the Lessee on
account of the consumption in the Apartment of gas or elec-
tricity, or both.  This limitation is subject to the right of
Lessor to install or caused to be installed equipment to sub-
meter the usage of gas or electricity, in which event Lessor
may require specific charges to be paid by the Lessee for the
usage of gas or electricity as measure by a submeter.

 (b) Such charges may be determined in the
proportion that the number of shares of Lessor allocated to
the Apartment bears to all shares of Lessor then issued and
outstanding, or in the approximate proportion that the floor
area of the Apartment bears to all floor areas measured by
such meter, or such other equitable method as may be deter-
mined by the Directors.

No Discrimination

 48. The Lessor will not discriminate against any
person because of his or her race, creed, religion, color,
national origin, ancestry, sex or other ground proscribed by
law when exercising any right reserved to it in this lease.

**Marginal Headings**

49.   The marginal headings of the several paragraphs of this lease shall not be deemed a part of this lease.

**Changes to Be in Writing**

50.   The provisions of this lease cannot be changed orally.

**Governing Law**

51.   The provisions of this lease shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in New York.

IN WITNESS WHEREOF, the parties have executed this lease.

SOUTHGATE OWNERS CORP.

By: *Gabi Stievelman*
Gabi Stievelman, President

_____ (L.S.)

_____ (L.S.)
     Lessee

-58-

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

On the 11½ day of November in the year 1987, before
me personally appeared Gabi Stievelman, to me known, who
being by me duly sworn, did depose and say that she resides
at 500 East 77th Street, New York, New York; that she is the
President of Southgate Owners Corp., the corporation de-
scribed in and which executed the foregoing instrument; that
she knows the seal of said corporation; that the seal affixed
to said instrument is such corporate seal; that it was so
affixed by order of the Board of Directors of said corpora-
tion, and that she signed her name thereto by like order.

VIJYA LAXMI PATEL
Notary Public, State of New York
No. 31-4892480
Qualified in New York County
Term Expires May 18, 1989

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

On the 11th day of November in the year 1987,
before me personally appeared Ann mooney, to me personally
known and known to me to be the individual described in and
who executed the foregoing instrument, and duly acknowledged
to me that he or she executed the same.

GABI M. STIEVELMAN
Notary Public, State of New York
No. 4883177
Qualified in New York County
Commission Expires Feb. 2, 1989

-59-

THIS PAGE LEFT BLANK INTENTIONALLY

## HOUSE RULES

 1.  The public halls and stairways of the Building shall
not be obstructed or used for any purpose other than ingress
to and egress from the Apartments in the Building, and the
fire towers shall not be obstructed in any way.

 2.  No patient of any doctor who has offices in the
Building shall be permitted to wait in the lobby.

 3.  Children shall not play in the public halls, courts,
stairways, fire towers or elevators and shall not be permit-
ted on the roof unless accompanied by a responsible adult.

 4.  No public hall above the ground floor of the Build-
ing shall be decorated or furnished by any Lessee in any man-
ner without the prior consent of all of the Lessees to whose
Apartments such hall serves as a means of ingress and egress;
in the event of disagreement among such Lessees, the Board of
Directors shall decide.

 5.  No Lessee shall make or permit any disturbing noises
in the Building or do or permit anything to be done therein
which will interfere with the rights, comfort or convenience
of other Lessees.  No Lessee shall play upon or suffer to be
played upon any musical instrument or permit to be operated a
phonograph or a radio or television loudspeaker in such Les-
see's Apartment between the hours of eleven o'clock p.m. and
the following eight o'clock a.m. if the same shall disturb or
annoy other occupants of the Building.  No construction or
repair work or other installation involving noise shall be
conducted in any Apartment except on weekdays (not including
legal holidays) and only between the hours of 8:30 a.m. and
5:00 p.m.

 6.  No article shall be placed in the halls or on the
staircase landings or fire towers, nor shall anything be hung
or shaken from the doors, windows, terraces or balconies or
placed upon the windowsills of the Building.

 7.  No awnings, window air-conditioning units or venti-
lators shall be used in or about the Building except such as
shall have been expressly approved by the Lessor or the
managing agent, nor shall anything be projected out of any
window of the building without similar approval.

 8.  No sign, notice, advertisement or illumination shall
be inscribed or exposed on or at any window or other part of
the Building, except such as shall have been approved in
writing by the Lessor or the Managing Agent.

-60-

9.   No bicycles, mopeds, scooters or similar vehicles,
or baby carriages shall be allowed to stand in the public
halls, passageways, areas or courts of the Building.

10.   Messengers and tradespeople shall use such means of
ingress and egress as shall be designated by the Lessor.

11.   Kitchen supplies, market goods and packages of
every kind are to be delivered only at the service entrance
of the Building and through the service elevator to the
Apartments when such elevator is in operation.

12.   Trunks and heavy baggage shall be taken in or out
of the Building through the service entrance.

13.   Garbage and refuse from the Apartments shall be
disposed of only at such times and in such manner as the
superintendent or the managing agent of the Building may
direct.

14.   Water closets and other water apparatus in the
building shall not be used for any purposes other than those
for which they were constructed, nor shall any sweepings,
rubbish, rags or any other article be thrown into the water
closets.  The cost of repairing any damage resulting from
misuse of any water closets or other apparatus shall be paid
for by the Lessee in whose Apartment it shall have been
caused.

15.   No Lessee shall send any employee of the Lessor out
of the Building on any private business of a Lessee.

16.   Except as hereinafter provided, no dog, cat, bird
or other domesticated pet (collectively, a "Pet") shall be
kept or harbored in the Building unless the same in each in-
stance has been expressly permitted in writing by the Lessor,
and such permission shall be revocable by the Lessor.  Not-
withstanding the foregoing, holders of Proprietary Leases
who, at the date of the issuance thereof, own or harbor any
Pet shall be entitled to keep and maintain such Pet without
Lessor's permission.  Furthermore, any such holder of a Pro-
prietary Lease entitled to own and harbor a Pet without Les-
sor's permission as provided in the preceding sentence shall
have the additional right to replace such Pet (without Les-
sor's permission) with another Pet of similar size and temp-
erament in the event such Pet is no longer residing in the
Apartment of such Proprietary Leaseholder.  In no event shall
dogs be permitted on elevators or in any of the public por-
tions of the Building unless carried or on leash.  No pigeons
or other birds or animals shall be fed from the windowsills,

-61-

terraces, balconies or in the yard, court spaces or public
portions of the Building, or on the sidewalk or street adja-
cent to the Building.

17.  No radio or television aerial shall be attached to
or hung from the exterior of the Building without the prior
written approval of the Lessor or the Managing Agent.

18.  No vehicle belonging to a Lessee or to a member of
the family or guest, subtenant or employee of a Lessee shall
be parked in such manner as to impede or prevent ready access
to any entrance of the Building by another vehicle.

19.  The Lessee shall use the available laundry facili-
ties only upon such days and during such hours as may be
designated by the Lessor or the Managing Agent.

20.  The Lessor shall have the right from time to time
to curtail or relocate any space devoted to storage purposes.

21.  Unless expressly authorized by the Board of Direc-
tors in each case, the floors of each Apartment must be
covered with rugs or carpeting or equally effective noise-
reducing material, to the extent of at least 80% of the floor
area of each room excepting only kitchens, pantries, bath-
rooms, closets, and foyers.

22.  No group tour or exhibition of any apartment or its
contents shall be conducted, nor shall any auction sale be
held in any apartment without the consent of the Lessor or
its Managing Agent.

23.  The Lessee shall keep the windows of the Apartment
clean.  In case of refusal or neglect of the Lessee during 10
days after notice in writing from the Lessor or the Managing
Agent to clean the windows, such cleaning may be done by the
Lessor, which shall have the right, by its officers or au-
thorized agents, to enter the Apartment for the purpose and
to charge the cost of such cleaning to the Lessee.

24.  The passenger and service elevators, unless of au-
tomatic type and intended for operation by a passenger, shall
be operated only by employees of the Lessor, and there shall
be no interference whatsoever with the same by Lessees or
members of their families or their guests, employees or
subtenants.

25.  Complaints regarding the service of the Building
shall be made in writing to the managing agent of the Lessor.

26.  Any consent or approval given under these House
Rulings by the Lessor shall be revocable at any time by
Lessor.

27.  The following rules shall be observed with respect
to compactor or incinerator equipment, if any:

(i)  All wet debris is to be securely wrapped or
bagged in small package size to fit easily into the
hopper panel.

(ii)  Debris should be completely drip-free before
it leaves the apartment and carried to the incinerator
closet in a careful manner and in a drip-proof con-
tainer; then placed in the chute so it will drop into
the chute for disposal.

(iii)  No bottles or cans shall be dropped down the
chute before 10:00 a.m. or after 5:00 p.m., but shall be
left in a neat manner in the service elevator area, if
such items must be disposed of before 10:00 a.m. or
after 5:00 p.m.

(iv)  Cartons, boxes, crates, sticks of wood or
other solid matter shall not be stuffed into hopper
opening.  Small items of this nature may be left in a
neat manner on the compactor closet floor.

(v)  Under no circumstances should carpet sweepings
containing naphthalene, camphor balls or flakes, floor
scrapings, oil soaked rags, empty paint or aerosol cans
or any other inflammable, explosive, highly combustible
substances or lighted cigarettes or cigar stubs be
thrown into the compactor chute.

(vi)  Vacuum cleaner bags must never be emptied
into the flue.  Such dust, dirt, etc. should be wrapped
in a securely tied bag or package and then be placed
through hopper door panel into chute.

(vii)  The superintendent shall be notified of any
drippings, or moist refuse, appearing on compactor
closet floor and corridors.

28.  No Lessee shall install any plantings on the ter-
race, balcony or roof without the prior written approval of
the Lessor.  Plantings shall be contained in boxes of wood
lined with metal or other material impervious to dampness and
standing on supports at least two inches from the terrace,
balcony or roof surface, and if adjoining a wall, at least

-63-

three inches from such wall.  Suitable weep holes shall be
provided in the boxes to draw off water.  In special loca-
tions, such as a corner abutting a parapet wall, plantings
may be contained in masonry or hollow tile walls which shall
be at least three inches from the parapet and flashing, with
the floor of drainage tiles and suitable weep holes at the
sides to draw off water.  It shall be the responsibility of
the Lessee to maintain the containers in good condition, and
the drainage tiles and weep holes in operating condition.

29.  The agents of the Lessor, and any contractor or
workman authorized by the Lessor, may enter any apartment at
any reasonable hour of the day for the purpose of inspecting
such apartment to ascertain whether measures are necessary or
desirable to control or exterminate any vermin, insects or
other pests and for the purpose of taking such measures as
may be necessary to control or exterminate any such vermin,
insects or other pests.  If the Lessor takes measures to con-
trol or exterminate carpet beetles, the cost thereof shall be
payable by the Lessee, as additional rent.

30.  If there is a garage in the Building, the Lessee
will abide by all arrangements made by the Lessor with the
garage operator with regard to the garage and driveways
thereto.

31.  These House Rules may be added to, amended or re-
pealed at any time by resolution of the Board of Directors of
the Lessor.

-64-

**Recognition Agreement**

Chase Loan Number:

[This form is not intended for use where the Proprietary Lease already has "financing provisions" which duplicate the substance of this agreement or are at substantial variance with the provisions of this agreement.]

Premises:     434 E 52nd Street
              New York, NY 10022
Apartment:    9B

Gentlemen:

We have been asked by Eiko Imai & Yoske Imai, Y.I. ("Lessee") for a loan of $357500.00 to be secured by a pledge, security interest, mortgage and/or assignment (hereinafter sometimes collectively referred to as "the Security") of shares of your Corporation ("Lessor") allocated to the above Apartment and of the Proprietary Lease (the "Lease") appurtenant thereto (the shares and Lease collectively referred to as "the Apartment").

1. (a) You are a New York corporation formed for the purpose of cooperative ownership and (owner in fee) of the above premises. (ground tenant)

   (b) Your records show that the Lessee is the owner of the Apartment.

   (c) You have duly approved or consented to the creation by the Lessee of the Security, if and to the extent such approval is required by the Lease.

2. (a) You will not consent to any further encumbrances, subletting, termination, cancellation, surrender or modification of the Apartment by the Lessee without our approval, which we will not unreasonably withhold but this provision shall not apply to any modification or termination which, by the terms of the Lease, may be effective against a Lessee when approved by a fixed percentage of other holders of your shares, or which may be effective in the event of condemnation or casualty.

   (b) The Lessee has agreed that, without our written approval, the Lessee will not exercise any right that he may have under the lease to terminate the lease so long as the loan is outstanding. Accordingly, you will not consider any attempt to do so effective.

   (c) You will notify us of any notice of intention to terminate the Lease, and

      (1) If the Lessee's default can be cured by the payment of money, you will also notify us promptly of any default involving an amount equal to or exceeding three months maintenance payments and will take no action to terminate the Lease or cancel the shares if the default be cured either by us for the account of the Lessee or by the Lessee within 15 days after such notice of default or intention to terminate; or

      (2) If the default cannot be so cured, you will institute no action to terminate the Lease or cancel the shares until we have had reasonable notice and opportunity, by action or otherwise, to induce the Lessee to cure the default, such opportunity to be no less than the time provided in the Lease for the Lessee to cure.

      (3) If you shall terminate the Lease and cancel the shares for a default not curable by the payment of money, then, provided we pay you the amounts which are due to you under the Lease (including its deficiency clause) when due, you shall not sell or sublet the apartment without our approval, unless the net proceeds of such sale or subletting shall equal or exceed the amount owing to us by Lessee.

   (d) You will accept payment from us on behalf of Lessee of any sums due under the Lease (including its deficiency clause), any payments made by us under the terms of this agreement will be deemed so paid, and no payments made in accordance herewith shall be deemed to limit our rights against the Lessee pursuant to law.

   (e) You shall recognize our right as lienor against the Apartment pursuant to the Security, and, if the

© 1973 by Aztech Documents Systems, Inc.    Approved by the Cooperative Housing Lawyers Group

Lease be terminated and/or shares cancelled, against the net proceeds of any sale or subletting of the apartment, after reimbursement to you of all sums due you under the Lease.

3. (a) Before delivery of this letter by you to us, we will have authority from the Lessee to give, and will, on request, give you a copy of the financial and credit information provided by him, but shall be under no duty to advise you of the results of any credit check we may make.

(b) Notwithstanding any apparent authority granted to us under agreements with the Lessee, WE SHALL HAVE NO RIGHT OR POWER TO TRANSFER THE APARTMENT UPON FORECLOSURE OR OTHERWISE EITHER TO US OR ANYONE ELSE WITHOUT YOUR APPROVAL AS REQUIRED BY THE LEASE provided, however, that nothing contained herein shall limit any rights we may have to dispossess the Lessee pursuant to law or realize upon our security in accordance herewith.

(c) If through oversight or negligence you or your agents or employees shall fail to notify us of Lessee's default prior to termination of the Lease, we will not seek to hold you or your agents or employees liable for breach of this agreement, provided that:

(1) you advise us promptly after discovering your failure, and

(2) if you have already sold or contracted to sell the Apartment, that you pay us the net proceeds of such sale (after reimbursing yourselves for all sums due you), or such lesser sum as shall equal the amount owing to us by the Lessee (the balance being payable to the Lessee), or

(3) if you have not contracted to sell the Apartment, that the provisions of paragraphs "2.(c)(3)" and "2.(e)" hereof shall apply.

(d) We will indemnify you and your agent against loss, liability or expense incurred in connection with any claim by the Lessee, his successors or assigns against either of you arising out of our representations pursuant hereto or your agreements herein (except as stated in paragraph "3.(a)" hereof), provided you give us prompt notice of any such claim. We may contest such claim in your name and on your behalf, but at our sole cost and expense, and you will execute such documents and do such things as are reasonably necessary to assist us in such contest.

4. While we have the right but no obligation to cure the Lessee's defaults under the Lease, if we do not do so within the time provided for herein, you shall have no obligation to us, except that in the event of sale or subletting the Apartment, you shall recognize our rights as lienor against the net proceeds of any sale or subletting (after reimbursement to you of all sums which are due to you under the Lease).

Any notice or approval provided for herein shall be deemed valid only if in writing and sent by registered or certified mail, as follows: to you, in care of your Managing Agent, with a copy by regular mail addressed to us at: JP Morgan Chase Bank, N.A., 1500 North 19th Street, Monroe, LA 71201

Either of us may change the address to which notices or approval shall be mailed by notice given as herein provided. This letter and the representations and agreements contained herein shall be deemed made as of the date of the making of the loan.

Agreed To:

By: _____
                              Lessor
                Cooperative Corporation

Approved:

_____ -Lessee
Eiko Imai

JPMorgan Chase Bank, N.A.

By: _____
        Stan G. Horowitz, Esq.
        Authorized Agent

Approved:

_____ -Lessee
YOKE | MAI Y.I.

© 1973 by Aztech Documents Systems, Inc.                    Approved by the Cooperative Housing Lawyers Group



SOUTHGATE OWNERS CORP.

INCORPORATED UNDER THE LAWS OF THE STATE OF NEW YORK

TOTAL AUTHORIZED ISSUE
PAR VALUE $1.00 EACH

SEE REVERSE FOR
CERTAIN DEFINITIONS

9B

**167**

Number 1002

This is to Certify that    Eiko Imai & Yoske Imai                    is the owner of

**One Hundred Sixty Seven**

FULLY PAID AND NONASSESSABLE SHARES OF THE CAPITAL STOCK OF
SOUTHGATE OWNERS CORP.

transferable on the books of the Corporation by the holder hereof in person or by duly
authorized Attorney, upon surrender of this Certificate, properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated

SECRETARY/TREASURER

PRESIDENT/VICE PRESIDENT

ASHBROOK PRINTING & ENGRAVING, INC., N. Y. C.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or, regulations:

| | | | |
|---|---|---|---|
| TEN COM | —as tenants in common | UNIF GIFT MIN ACT — | . . . . . . . . Custodian . . . . . . . . . . . . . . |
| TEN ENT | —as tenants by the entireties | | (Minor) |
| JT TEN | —as joint tenants with right of survivorship and not as tenants in common | | under Uniform Gifts to Minors Act . . . . . . . . . . . . . . . . . . . . . . . . (State) |

Additional abbreviations may also be used though not in the above list.

## For value received — hereby sell, assign and transfer unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

_____ Shares
represented by the within Certificate, and do hereby irrevocably
constitute and appoint
_____ Attorney
to transfer the said Shares on the books of the within named
Corporation with full power of substitution in the premises.
Dated _____ 19 _____
In presence of

_____

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER

The rights of any holder hereof are subject to the provisions of the By-Laws of the Corporation, and to all the terms, covenants and conditions of the proprietary lease of the person in whose name the share certificate is issued, which limits and restricts the title and rights of any transferee of the share certificate. The shares represented by the certificate are transferable only as an entirety and only to an approved assignee of such proprietary lease. Copies of the proprietary lease and the By-Laws are on file and available for inspection at the office of the Corporation.

The Directors of the Corporation may refuse to consent to the transfer of the shares represented by the certificate until any indebtedness of the shareholder to the Corporation is paid. The Corporation, by the terms of the By-Laws and proprietary lease, has a first lien on the shares represented by the certificate for all sums due and to become due under said proprietary lease.

Notice is hereby given pursuant to Sections 616 and 709 of the Business Corporation Law that the Certificate of Incorporation contains provisions authorized by Sections 616 and 709 of said Law prescribing special provisions for quorum, vote or consent of shareholders and directors and the holder of this certificate is charged with knowledge thereof and holds the same subject to said provisions.

## IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED,** I/We hereby sell, assign and transfer to _____

_____

Social Security Number_____/Taxpayer ID Number_____,

_167_ number of shares of the Capital Stock of _Southgate Owners Corp._ represented by Certificate

Number(s) ___1002___ inclusive, standing in my/our name(s) on the books of said Company.

I/We hereby irrevocably constitute and appoint _____

_____

attorney, to transfer the said stock on the books of said Company with full power of substitution in

the premises.

Dated:

_____          _____
Eiko Imai - Borrower                                     Yoske Imai- Borrower


_____          _____
- Borrower                                                 - Borrower

In the present of:


_____

IRREVOCABLE STOCK POWER -- NY Co-ops  CB-3156 (4/97)

## ASSIGNMENT OF LEASE

I/We received this day from JP Morgan Chase Bank, N.A. (the "Lender"), a loan in the amount of $356,170.00 in connection with cooperative apartment #9B in the building located at: (434 East 52nd Street, New York, New York 10022.

To secure the repayment of the loan, I/We hereby assign to the Lender and any subsequent holder of the Note evidencing the loan (the "Note"), all of my/our rights under a *proprietary lease* (the "Lease") made between me/us and  Southgate Owners Corp.  and dated _____ for the above apartment. This Assignment shall include all amendments to, and extensions and renewals of, the Lease. This Assignment shall remain in effect for as long as part of the loan remains unpaid, and is subject to all of the terms and conditions of the Lease.

Provided that, upon performance of all my obligations under the Note and the Loan Security Agreement entered into between me and the Lender on the date of this Agreement, this Assignment shall be void and of no further force of effect.

Dated: August 17, 2009 _____

_____         _____
Eiko Imai                                 Yoske Imai


State of New York            )
                             )  ss:
County of New York           )

On this 17th day of August, 2009 before me, the undersigned, personally appeared Eiko Imai and Yoske Imai, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) are subscribed to the within instrument, and acknowledged to me that they executed the same in their capacity(ies), and that by their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument .

_____
(Signature and office of individual taking acknowledgment)

ADAM ROTHENHAUS
Notary Public, State of New York
No. 02RO6067726
Qualified in New York County
Commission Expires December 17, 2009

ASSIGNMENT OF LEASE II -- NY CO-OP CB-3153 (3/97)

# LOAN SECURITY AGREEMENT



THIS AGREEMENT IS A LOAN SECURITY AGREEMENT dated the 17th day of August, 2009 in favor of JP Morgan Chase Bank, N.A. and having an office at 1111 Polaris Parkway, Columbus, OH 43240, (the "Lender"), by Eiko Imai and Yoske Imai (the "Borrower"), residing at 434 East 52nd Street, Apt. 9B, New York, New York 10022.

In this Loan Security Agreement, the words "I", "me", "my" and "mine" mean each of every person who signs this Loan Security Agreement. The words "you" and "your" mean the Lender named above, or any other person or organization to whom Lender assigns this Loan Security Agreement.

## 1. OWNERSHIP

I own 167 shares (the "Shares") of capital stock of Southgate Owners Corp. (the "Corporation") and am the tenant under a proprietary lease (the "Lease") for Apartment 9B (the "Apartment") in the building located at 434 East 52nd Street, Apartment 9B, New York, New York 10022, (the "Building"). I represent to you that the Shares are all the shares of capital stock in the Corporation that are allocated to the Apartment. I represent that I have not been known by any other name during the last ten years except as I have already disclosed to you in the credit application or a separate writing.

## 2. TRANSFER OF INTEREST AS SECURITY

By signing this Loan Security Agreement I give, assign and pledge to you a security interest (the "Security Interest") in the property described in paragraph 4 below. There is no other existing security interest in that property. Similarly, neither the Lease, certificate of incorporation nor the bylaws of the Corporation prohibit me from giving the Security Interest to you.

## 3. DEBT WHICH IS SECURED BY THIS LOAN SECURITY AGREEMENT

This Loan Security Agreement will secure the repayment of all amounts I owe you under the note (the "Note"), dated the date of this Loan Security Agreement, in the principal amount of $356,170.00, plus interest and other amounts as provided in the Note and any and all other amounts I owe you under this Loan Security Agreement. The terms and provisions of the Note form a part of this Loan Security Agreement as if they were repeated here, and must be considered included in the terms and provisions of this Loan Security Agreement.

## 4. SECURITY

All of the property in which a security interest is given by this Loan Security Agreement is called the "Security", and includes:

A. All my right, title and interest in and to the Shares and the Lease. This includes any replacement, substitute or additional shares allocated to the Apartment. It also includes any amendments and extensions to, or replacements of or substitutes for, the Lease; and

B. All proceeds, including:
(i) any proceeds from any sale, assignment or other transfer of the Shares, the Lease or the Apartment, or;
(ii) any proceeds attributable to the Shares, the Lease or the Apartment received because of the dissolution, liquidation or other termination of the existence of the Corporation, or;

(iii)    any proceeds received because of a capital or other distribution made by the Corporation with respect to the Shares, the Lease or the Apartment, or;

(iv)    any proceeds of awards or claims for damages resulting from condemnation or other governmental taking of the Building or of the Lease or Apartment, or;

(v)    any proceeds paid to me under any insurance policy covering the Apartment, the Corporation or the Building.

All of these proceeds will be paid to you. If the proceeds are paid to me, I will hold them in trust for you and promptly after receipt deliver them to you. The proceeds will be used to reduce the amount I owe you under the Note and this Loan Security Agreement. If the proceeds are not sufficient to pay off what I owe you in full, then I must still pay you the difference. If any of the proceeds remain after the amount I owe you has been paid in full, the remaining proceeds will be paid to me.

## 5. PROMISE TO PAY

I promise to pay all the amounts as provided in the Note to you or anyone you name.

## 6. DELIVERY OF SHARES AND LEASE; END OF SECURITY INTEREST

I represent that I have delivered to you on or prior to the date of this Loan Security Agreement all of the certificate(s) for the Shares and the duplicate original of the Lease, together with an executed stock power, an assignment of Lease. I shall, without notice or demand, immediately deliver to you any replacement, substitute or additional certificate(s) for the Shares that may be allocated to the Apartment, and any amendments or extensions to, or replacement of or substitute for, the Lease.

After the term of the Note and this Loan Security Agreement have ended and I have repaid all amounts owing under those agreements, the Security Interest will terminate and you will return to me any certificate(s) for the Shares and the duplicate original Lease (including any such replacement, substitute or additional certificate(s) for the Shares and any amendments or extensions to, or replacement of or substitute for, the Lease) then in your possession. You will thereafter have no further obligation or responsibility to me.

## 7. REPAIRS AND ALTERATIONS; INSURANCE

I will keep the Apartment in good repair, and I will not make major alterations to it without obtaining your prior written consent. If any of the fixtures are destroyed or removed, I will replace them immediately with others of the same or better quality and condition. I will use my best efforts to cause the Corporation to maintain a hazard insurance policy on the Building which meets at least your minimum standards. if the building fails to maintain a hazard insurance policy at your minimum stnadars, I understand that you may accelerate the payment of the Loan.

## 8. RIGHT TO INSPECT PROPERTY

You have the right to enter and inspect the Apartment at any reasonable time upon reasonable notice.

## 9. PAYMENT OF FEES AND ASSESSMENTS AND COMPLIANCE WITH OTHER DUTIES

I will pay all maintenance fees and any special assessments or any other charges imposed by the Corporation or any governmental authority with respect to the Security when they are due. Even if the Corporation or any governmental authority gives me the choice to pay any maintenance fee, special assessment or other charge in installments rather than all at the same time, you can require me to pay the whole amount of the maintenance fee, special assessment or charge at the time the first installment is due. I will show you any receipts for payment of any maintenance fees, special assessments or the charges within ten (10) days after you ask to see them. I also agree to perform all my other obligations under the Lease, to take any actions necessary to prevent any default under the Lease and to comply with the bylaws and rules

and regulations of the Corporation. If I do not pay any of these fees, assessments or charges when they are due, do not perform my obligations under the Lease, or do not take any actions necessary to prevent defaults under the Lease, or do not comply with the bylaws or the rules and regulations of the Corporation, you may, but are not required to do so for me. If you do so, I will repay you the amount of those payments or the cost of those acts (including, but not limited to reasonable attorneys' fees and costs) when you ask for repayment.

## 10. COMPLIANCE WITH LAWS AND REGULATIONS

I agree I will not use the Apartment for any unlawful purpose. If I receive a notice from any governmental authority that the Apartment or my use or maintenance of it violates any regulation, order or law, then I agree that I must correct the violation and comply with the regulation, order or law as required but in no event later than that sixty (60) days after the date of such notice.

## 11. HAZARDOUS SUBSTANCES

I agree I will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances in the Apartment. I shall not do, nor allow anyone else to do, anything affecting the Apartment that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage in the Apartment of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Apartment.

I represents that I have no actual knowledge of any investigation, claim demand, lawsuit or other action by any governmental or regulatory agency or private party involving or affecting the Apartment and any Hazardous Substances or Environmental Law and I agree to give Lender prompt written notice of any such information coming to my attention.

As used in this paragraph 11, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and law of the jurisdiction where the Apartment is located that relate to health, safety or environmental protection.

## 12. CONSENT TO SALE OR LATER SECURITY INTEREST IN THE SECURITY

A. I will not sell, transfer or permit the transfer of my ownership of the Security, or give or permit anyone else another security interest in it without Lender's consent. If you become aware that I have taken any of these actions, you may, in accordance with this Loan Security Agreement, require me to pay you immediately upon demand the full amount then due under the Note and this Loan Security Agreement.

If you exercise this right, you will give me notice of acceleration. The notice will provide a period of not less than thirty (30) days from the date the notice is delivered or mailed within which I must pay the full amount then due under the Note and this Loan Security Agreement and all other sums secured by this Loan Security Agreement. If I fail to pay these sums before the end of this period, you may exercise any remedies permitted by this Loan Security Agreement and/or under law without giving me any further notice or demand.

B. I will not cause or permit any sublet of the Apartment without obtaining the following prior written approvals:

(i)    I will obtain the valid approval from the Corporation; and
(ii)   I will obtain approval from you. Consent will not be unreasonably withheld. (It is understood, however, that you may, in your discretion and for any reason or for no reason, withhold any consent to any subletting of greater than 24 month.)

Also, I will not cause or permit any sublet of the Apartment if the same will result in a default under the Lease or the bylaws of the Corporation (or under any other document or instrument related to the Lease or

the bylaws). I will not modify, extend or terminate any sublease and I will comply with all conditions in connection with such sublease which are imposed by you or the Corporation. My obligations under the Note and this Loan Security Agreement will not be affected by any subletting. All subleases of the Apartment will provide that the same may be cancelled by any new tenant under the Lease.

C. At your request, I will assign to you all leases of the Apartment and all security deposits made in connection with leases of the Apartment. Upon the assignment, you will have the right to modify, extend or terminate the existing leases and to execute new leases. As used in this paragraph C, the word "lease" will mean "sublease" if the Loan Security Agreement is on a leasehold.

D. I unconditionally assign and transfer to you all the rents and revenues of the Apartment. I authorize you or your agents to collect the rents and revenues and hereby direct each tenant, permitted subtenant and permitted occupant of the Apartment to pay the rents to you or your agents. However, prior to your notice to me of my breach of any covenant or agreement in the Note and this Loan Security Agreement, I will collect and receive all rents and revenues of the Apartment as trustee for the benefit of you and me. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If you give notice of breach to me:

   (i)     all rents received by me will be held by me as trustee for you benefit only, to be applied to the full amount then due under the Note and this Loan Security Agreement and all other sums secured by this Loan Security Agreement;

   (ii)   you will be entitled to collect and receive all of the rents of the Apartment; and

   (iii)  each tenant, permitted subtenant and permitted occupant of the Apartment will pay all rents due and unpaid to you or your agent on your written demand.

I have not executed any prior assignment of the rents and have not and will not perform any act that would prevent you from exercising your rights under this paragraph D.

You will not be required to enter upon, take control of or maintain the Apartment before or after giving notice of breach to me. However, you or a judicially appointed receiver may do so at any time there is a breach. Any application of rents will not cure or waive any default or invalidate any other right or remedy of yours. This assignment or rents will terminate when the debt secured by this Loan Security Agreement is paid in full. I will not assign the rents and revenues of the Apartment to anyone else and I will not collect such rents for more than one (1) month in advance.

## 13. CHANGES IN THE LAW

If any new law is passed which requires you to pay a tax or special charge because you are the owner and holder of the Note and this Loan Security Agreement, then you may request that I pay you all of the debt that I owe you or, at your option, I will pay the tax or special charge.

I will pay you any and all of the amounts that I owe under the Note and this Loan Security Agreement, or the tax or special charge within thirty (30) days after you notify me about the passage of such a law.

## 14. OWNERSHIP AND RIGHTS IN THE SECURITY

I represent to you that I am the sole owner of the Security and have the full right to give this Security Interest to you. I represent that no person or company has any interest in, lien or encumbrance on, or claim against, the Security, or any right to sell all or any part of the Security if I fail to pay any debt I owe to them, except the Corporation. I agree to defend my ownership of the Security and your rights under this Loan Security Agreement against any claims made against them by anyone. I shall keep the Security free and clear from any other liens, claims or encumbrances.

I also promise to you that the Security pertains to an owner-occupied residence.

## 15. DEFAULT

I will be in default of this Loan Security Agreement if :

(a)  I fail to pay you the money I owe you under the Note and this Loan Security Agreement on
or before the date payment is due; or

(b)  if I fail to keep any of the other promises I have made to you in the Note or in this Loan
Security Agreement or if I have made any statement or representation in this Loan Security
Agreement or the Note or my loan application that is not correct; or

(c)  if any payment under the Lease is not made when due or any other default occurs under the
Lease, or I attempt to or cancel, surrender or assign the Lease prior to maturity of the Note,
or the Lease is cancelled or not renewed upon expiration of its term by the Corporation or,
if renewed, such renewal is on terms which adversely affect you rights under this Loan
Security Agreement; or

(d)  if I am in default under the Note or if I fail to pay or bond any judgment or tax deficiency
against me; or

(e)  the Building is sold or is destroyed or materially damaged; or

(f)  the Corporation fails to maintain adequate insurance, or to make mortgage payments or pay
real estate taxes with respect to, the Building; or

(g)  a bankruptcy, foreclosure or insolvency action or proceeding is brought by or against the
Corporation, or the dissolution of the Corporation is authorized by its shareholders or
directors; or

(h)  a bankruptcy, foreclosure or insolvency action or proceeding is brought by or against me, or
I die; or

(i)  a writ or order of attachment or garnishment shall be made or issued against any of my
property; or

(j)  a receiver is appointed for a portion of my property; or

(k)  any other party without your consent establishes a security interest in the Security, or

(l)  any event of default under any other Loan Security Agreement or Promissory Note between
you and me dated as of the date hereof shall occur.

If I have defaulted under this Loan Security Agreement, you can decide that the entire amount I owe you
under the Note and this Loan Security Agreement is immediately due and payable. This is called your right
to accelerate payment. You do not have to notify me or demand payment from me if you decide to accelerate
payment, unless the Note or this Security Agreement provides otherwise.

If a default occurs, you do not have to accelerate payment. If you do not accelerate payment at any time
when one default occurs, you do not give up your right to accelerate payment if the same default or any other
default occurs again.

I promise to pay interest to you on any amounts you pay to perform my obligations under this Loan
Security Agreement such as maintenance fees, assessments or other charges under the Lease. This interest
will be due at the rate provided for in the Note from the day that you incur the expense or make the payment
to the date on which I reimburse you. The repayment of any of these amounts plus interest are secured by
this Loan Security Agreement.

## 16. OBLIGATIONS WHEN PAYMENT IS ACCELERATED

If you accelerate payment, I must immediately pay you the entire amount I owe you under the Note and
this Loan Security Agreement, plus any accrued interest on this amount and any other charges I owe you.

## 17. YOUR RIGHTS ON DEFAULT

A.  If you accelerate payment and I do not pay you the entire amount of the debt I owe you, you will have
the right to sell the Security at public or private sale, with or without advertisement of the time, place or
terms of sale, except that if it is a private sale, it shall occur no less than five (5) days after written notice
to me. You shall determine the terms of any such sale in you sole discretion. A sale conducted according

to the usual practice of financial institutions selling similar security will be considered reasonably conducted. You may sell the Security for immediate cash payment or on credit. If the sale is on credit, you will retain the Security until the sale price is paid in full. You will not be liable if the buyer fails to pay, and you may the re-sell the Security. You have the right to use the money you receive from any sale to pay collection and sale expenses (including but not limited to brokers' commissions and transfer taxes and fees) and your reasonable attorneys' fees (as provided in paragraph 18) as well as any payments due under the Lease and to repay what I owe on any superior liens and my debt to you. If the money you receive from the sale is not sufficient to pay off all expenses, amounts I owe the Corporation, the debt I owe on superior liens and my debt to you, I must still pay you the difference and you can get a personal judgment against me for this amount. If the sale brings in more money than is needed to pay your expenses, amounts I owe the Corporation, my debt on superior liens and my debt to you, the money left over will be paid to me.

   B.  You may elect to continue to hold the Shares and the Lease if you determine that a better price can be obtained at a later date, and absent gross negligence, you will not be liable to me for any loss in value in the Security. If you have the right to sell the Security, and have not begun to do so within ninety (90) days, I may demand that you proceed to sell the Security or I may make the sale myself, at my own expense. However, you will not be required to sell the Security if the net proceeds would not be sufficient to repay in full my debt to you under the Note or this Security Agreement. Similarly, you may not prevent me from making the sale if the net proceeds would be sufficient to repay my debt in full.

   C.  If you elect to retain the Security, you will give me notice of your election. If I object to your election within thirty (30) days after your notice, you will offer the Security for sale and must sell if the net proceeds would be sufficient to pay all that I owe you under the Note and this Loan Security Agreement.

   D.  You will have the right, in connection with a sale, to complete a stock power and assignment of lease in order to transfer the Shares and the Lease. I hereby give you the right, in connection with such sale, to request that the Corporation terminate the Lease and take all lawful steps necessary to obtain possession of the Apartment for and on your behalf. I will promptly vacate my Apartment upon the sale of the Security or upon your earlier request. You may start legal proceedings to get possession of the Apartment if I refuse to so vacate. The cost of these proceedings will be borne by me and may be added to the amount I owe you under the Note and will be secured by this Loan Security Agreement.

   E.  You or anyone designated by you may purchase the Security as stated above, free of my right to redeem the Security, which right of redemption I now waive.

   F.  You may seek the appointment of a receiver, without notice to me and without regard to the adequacy of the Security.

## 18. ENFORCEMENT

   You can ask an attorney either to sell the Security as provided in paragraph 17, to collect the money I owe you under the Note and this Loan Security Agreement, or to enforce any of the promises I have not kept. If you hire an attorney to do any of these for you, you can add all reasonable legal fees, costs, allowances and disbursements to the amount I owe you under this Loan Security Agreement, together with interest on such amount at the rate provided in the Note.

## 19. RECEIVER OF RENTS

   If you commence a law suit to foreclose the Security Interest, you can ask the court to appoint someone to look after the Security and to collect rents from any tenants, subtenants or occupants in the Apartment. This person is called a "Receiver". This action can be taken without prior notice to me and without consideration of the value of the Security. If I occupy all or any part of the Apartment, then the Receiver can collect a reasonable charge from me for the use and occupancy of it.

## 20. ASSIGNMENT OF RENTS

I give you the right to collect all rents due from any tenants, subtenants or occupants of the Apartment. You agree that before you exercise your rights, I can collect the rents. You can collect the rents five (5) days after you have given me written notice that I have not kept the promises I have made in the Note or this Loan Security Agreement. I will not assign the rents to any other person and I will not collect more than one (1) months' rent in advance without your prior written consent.

## 21. USE OF THE MONEY LOANED TO ME

I agree to comply with the trust fund provision of Section 13 of the New York Lien Law by using any money I receive from you for the purpose of paying the cost of any improvements made to the Apartment or otherwise with respect to the Security before I use any of the money for any other purpose.

## 22. FILING AND RECORDING FEES AND TAXES

You may file or record this Loan Security Agreement, financing statements, renewal or continuation financing statements and any other document which you decide may be advisable in order to protect your Security Interest. I agree to sign such financing statement, renewal or continuation financing statements or other document. I will sign these financing statements, renewal or continuation financing statements and other documents on request or, at your option, you are authorized to sign them in my name as attorney-in-fact. I will also, on your request, sign any affidavits or other documents which may be necessary to maintain the priority of the lien of this Loan Security Agreement, or to release or enforce the liens including but not limited to any amendments, corrections, deletions or additions to the Note or this Loan Security Agreement.

I agree to pay all filing, recording and other fees or taxes that may be incurred, including filing fees for financing statements and mortgage recording taxes, if any, which may be due with respect to this Loan Security Agreement and any advances and re-advances under this Loan Security Agreement and the Note (except for any mortgage recording taxes which New York law requires you to pay). If I do not pay any such filing, recording or other fees or taxes when they are due (i) you may do so for me and I will repay you when you ask for repayment or (ii) at your discretion, I will be held in default under this Security Agreement..

## 23. DEFENSE OF YOUR RIGHTS

If you have to defend your rights under the Note or this Loan Security Agreement, then any money you have to pay (including reasonable attorneys' fees and charges as provided in paragraph 18) will be added to the amount I owe you under the Note. I will pay this money promptly, at your request, together with interest on such amount at the rate provided in the Note. In certain cases, you may be required by New York law to pay my reasonable attorneys' fees.

## 24. NOTICES

You may give any written notices about the Note or this Loan Security Agreement to me by personal delivery to the Apartment or by certified or ordinary mail sent to the address of the Apartment. I may give written notice by personal delivery or certified ordinary mail to you at 780 Kansas Lane, Suite B, Monroe, LA 71203, or a different address if I am given written notice of that address.

## 25. STATEMENTS ABOUT THE SECURED DEBT AND ADDITIONAL DUTIES

If you ask me, I will confirm in a signed statement of the amount I owe you under the Note and this Loan Security Agreement and whether or not I have any rights or claims to reduce or not to pay this amount. I must give you this statement within five (5) days if you ask me for the statement in person or within ten (10) days if you ask me for the statement by mail.

## 26. NON-LIABILITY OF CORPORATION

The Corporation, its directors, officers, agents or attorneys will not be liable to me if the Corporation transfers the Shares and Lease as required by this Loan Security Agreement, or brings any proceeding to dispossess or evict me from the Apartment because of a default under this Loan Security Agreement. The Corporation may refuse to effect a transfer of the Shares and Lease made without your prior written consent.

## 27. CHANGES IN THIS LOAN SECURITY AGREEMENT

This Loan Security Agreement may be changed only in writing by you and me.

## 28. OTHER RIGHTS

A.  If I do not perform any obligation of mine in this Loan Security Agreement, or if I otherwise breach an obligation of mine, you may, but are not required to, perform the obligation or remedy the breach. If you do so, I will repay you the amount it costs you to perform the obligation or remedy the breach (including, but not limited to, any reasonable attorneys' fees and costs) when you ask for repayment. I will pay you interest on this amount at the rate provided for in the Note from the day you pay the amount to the date on which I reimburse you. The repayment of any such amount, including interest, is secured by this Loan Security Agreement.

B.  In addition to the other agreements and rights which are in this Loan Security Agreement, you will have all of the rights provided under law, even if those rights are different from the rights which are in this Loan Security Agreement.

## 29. ENFORCEMENT OF YOUR RIGHTS

If you do not exercise or enforce any of the rights you may have under this Loan Security Agreement, the Note or under the law at any time, you will still have all of those rights and you may exercise and enforce them in the future. Each of your rights under the Note and this Loan Security Agreement are separate. You can exercise and enforce one or more of those rights as well as any of your rights under the law one at a time or all at the same time.

## 30. MY RIGHTS BEFORE DEFAULT

Until there is a default under this Loan Security Agreement or the Note and you have demanded payment in full, I will have all rights, responsibilities and privileges of a shareholder and lessee. Except as otherwise provided in this Loan Security Agreement, my obligations under the Lease will continue after any such default by me.

## 31. GOVERNING LAW

This Loan Security Agreement will be governed by the laws of the State of New York. If any provision of this Loan Security Agreement is found invalid, the remainder of this Loan Security Agreement will still be binding and effective.

## 32. PERSONS OBLIGATED UNDER THIS SECURITY AGREEMENT

Until I have satisfied all my obligations under the Note and this Loan Security Agreement, the agreements and promises contained in this Loan Security Agreement will be binding upon me, my heirs and all people acting for me, and also on all future owners and tenants of the Apartment. This paragraph shall not be read as giving me the right to sublet the Apartment, assign the Lease or transfer the Shares. This Loan Security Agreement is for your benefit and for the benefit of anyone to whom you transfer, sell or assign the Note and this Loan Security Agreement and your rights in the Security.

If there is more than one person signing this Loan Security Agreement, each shall be separately and jointly responsible for keeping the promises and agreements made in this Loan Security Agreement.

_____           _____
Witness                                Eiko Imai- Borrower

_____           _____
Witness                                Yoske Imai- Borrower

_____           _____
Witness                                - Borrower

_____           _____
Witness                                - Borrower

State of New York        )
                         )    ss:
County of New York       )

On this 17th day of August, 2009 before me, the undersigned, personally appeared Eiko Imai and Yoske Imai, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) are subscribed to the within instrument, and acknowledged to me that they executed the same in their capacity(ies), and that by their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument .

_____
(Signature and office of individual taking acknowledgment)

ADAM ROTHENHAUS
Notary Public, State of New York
No. 02RO6087725
Qualified in New York County
Commission Expires December 17, 2009

Loan Number 

# LOAN MODIFICATION AGREEMENT
(Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 1ST day of MAY, 2012, between EIKO IMAI ("Borrower") and JPMORGAN CHASE BANK, N.A. ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated AUGUST 17, 2009 and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and property described in the Security Instrument and defined therein as the "Property", located at

434 E 52 ST UNIT 9B, NEW YORK, NEW YORK 10022
(Property Address)

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1.  As of MAY 01, 2012, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $383,388.65 consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2.  Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest be charged on the Unpaid Principal Balance at the yearly rate of 5.125%, from APRIL 01, 2012. Borrower promises to make monthly payments of principal and interest of U.S. $1,680.54, beginning on the 1ST day of MAY, 2012, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. The yearly rate of 5.125% will remain in effect until principal and interest are paid in full. If on APRIL 01, 2052 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3.  If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

4.  Borrower understands and agrees that:

    (a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

    (b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to

JPMC MODIFIED LOAN MODIFICATION AGREEMENT – Single Family – Fannie Mae   UNIFORM INSTRUMENT     ver.
03_20_2012_11_01_44    Form 3179    1/01 (rev. 01/09)                                      (page 1 of 5 pages)

Loan Number ▓▓▓▓▓▓

which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender

(e) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

5. If Borrower previously received a chapter 7 bankruptcy discharge but did not reaffirm under applicable law amounts due under the Note:

(a) Notwithstanding anything to the contrary contained in this Agreement, Borrower and Lender acknowledge the effect of a discharge in bankruptcy that, if granted to Borrower prior to the execution of this Agreement,

(b) Lender may not pursue Borrower for personal liability. However, Borrower acknowledges that Lender retains certain rights, including but not limited to the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances.

(c) The parties agree that the consideration for this Agreement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of Borrower's default thereunder.

(d) Nothing in this Agreement shall be construed to be an attempt to collect against Borrower personally or an attempt to revive personal liability.

6. Borrower hereby absolutely and unconditionally assigns and transfer to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon this assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold estate.

Borrower hereby absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default under this Agreement, pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the

Loan Number

Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

7.  By this paragraph, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked, and Borrower has been advised of the amount needed to fully fund the Escrow Items.

8.  If the original loan documents did not include standard provisions for escrow items, Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon

Loan Number ████████

such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

Loan Number  ▮▮▮▮▮▮

### TO BE SIGNED BY BORROWER ONLY

BORROWER SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE
BANK, N.A. And EIKO IMAI, LOAN NUMBER ▮▮▮▮▮ WITH A MODIFICATION EFFECTIVE DATE
OF May 01, 2012

In Witness Whereof, the Borrower(s) have executed this agreement.

_____     Date: 3 / 28 / 12
Borrower - EIKO IMAI

JPMC MODIFIED LOAN MODIFICATION AGREEMENT – Single Family – Fannie Mae  UNIFORM INSTRUMENT     ver.
03_20_2012_11_01_44     Form 3179     1/01 (rev. 01/09)                              (page 5 of 6 pages)

Loan Number [REDACTED]

TO BE SIGNED BY LENDER ONLY

LENDER SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK,
N.A. And EIKO IMAI, LOAN NUMBER [REDACTED] WITH A MODIFICATION EFFECTIVE DATE OF May
01, 2012

In Witness Whereof, the Lender has executed this Agreement.

Lender

JPMORGAN CHASE BANK, N.A.

By: _____

Date: _____4·5·12_____          Ann Keys
                                      Vice President